UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

SYDNEY HART,

                              Plaintiff,

        — against —                                        Case No. 17-CV-5067 (LGD)

SUFFOLK COUNTY, KELLIE BURGHARDT,
MAXWELL EDWARDS, TIMOTHY CABLE,
JAMIE RICE, and KENNETH KOPCZYNSKI,

                              Defendants.


**PLAINTIFF SYDNEY HART'S POST-TRIAL**
**<u>PROPOSED FINDINGS OF FACT AND MEMORANDUM OF LAW</u>**

# TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT ................................................................................. 1

I.   The October 14, 2016, Assault ............................................................................... 1

II.  Ms. Hart's Injuries ................................................................................................ 9

III. Credibility Findings ............................................................................................. 10

    A.  Motives to Lie ................................................................................................. 10

        1.  Ms. Hart ................................................................................................... 10

        2.  Defendants ............................................................................................... 11

    B.  Credibility ....................................................................................................... 12

        1.  Ms. Hart ................................................................................................... 12

            a.  Ms. Hart's Consistency ................................................................... 12

            b.  Ms. Hart's Forthrightness ............................................................... 13

            c.  Unavailing Attempts at Impeachment .............................................. 14

        2.  Defendants ............................................................................................... 16

            a.  Individual Defendants' Evasive and Misleading Answers ................. 16

            b.  Defendants' Inconsistencies and Illogical Explanations ................... 17

            c.  Defendants Were Able to Align Their Testimony, and Did ............... 20

    C.  Ability to Recall ............................................................................................. 21

Conclusion ................................................................................................................. 23

MEMORANDUM OF LAW ....................................................................................... 25

Preliminary Statement ................................................................................................. 25

Legal Standards .......................................................................................................... 26

Argument .................................................................................................................... 27

I.   Individual Defendants Violated Sydney Hart's Fourteenth Amendment Right to Be
    Free from the Use of Excessive Force .................................................................... 27

    A.  Individual Defendants Used Excessive Force on Sydney Hart ......................... 28

        1.  There Was No Need for Individual Defendants to Use Any Force Against
            Sydney Hart ............................................................................................. 29

2. The Limited Extent of Ms. Hart's Injuries Does Not Preclude Her Excessive Force Claim ................................................................................... 30

3. Individual Defendants Made No Effort to Temper or Limit the Amount of Force .... 32

4. Sydney Hart Posed No Security Threat ................................................. 33

5. Sydney Hart Never Resisted ............................................................... 34

B. All Individual Defendants Were Personally Involved in the Excessive Force ................ 35

1. Individual Defendants Directly Participated in the Use of Excessive Force ............. 36

2. Individual Defendants Failed to Intervene to Prevent, Mitigate, or Stop the Use of Excessive Force ....................................................................... 36

a. Individual Defendants Had a Realistic Opportunity to Intervene ........................ 37

b. A Reasonable Person in Individual Defendants' Position Would Know That Sydney Hart's Constitutional Rights Were Being Violated ........................ 38

3. Individual Defendants Did Not Take Reasonable Steps to Intervene ........................ 39

II. Individual Defendants Assaulted and Battered Sydney Hart .................................. 39

A. Individual Defendants Committed Assault Against Sydney Hart ..................................... 39

B. Individual Defendants Committed Battery Against Sydney Hart ..................................... 40

C. Individual Defendants Are Not Entitled to the Justification Defense .............................. 41

D. Defendant Suffolk County Is Liable, as Individual Defendants' Employer, for Individual Defendants' Assault and Battery of Sydney Hart ............................................ 42

III. The Chiaro Incident Lends Credence to Ms. Hart's Version of Events and Undermines the Individual Defendants' Credibility ................................................................... 43

IV. Individual Defendants Are Not Entitled to Qualified Immunity ............................................ 44

V. Sydney Hart Is Entitled to Compensatory and Punitive Damages and Attorneys' Fees and Costs ................................................................................................................ 46

Conclusion ................................................................................................................ 47

# TABLE OF AUTHORITIES

## Cases

*Alhovsky v. Ryan*, 658 F. Supp. 2d 526 (S.D.N.Y. 2009) ............................................... 32

*Anderson v. Aparicio*, 25 F. Supp. 3d 303 (E.D.N.Y. 2014) ........................................ 47

*Anderson v. Branen*, 17 F.3d 552 (2d Cir. 1994) .................................................. 35, 38

*Anderson v. Creighton*, 483 U.S. 635 (1987) ............................................................ 45

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ................................................................... 44

*Brown v. City of New York*, 798 F.3d 94 (2d Cir. 2015) .............................................. 31

*Charkhy v. Altman*, 252 A.D.2d 413 (1st Dep't 1998) ................................................ 39

*Davis v. Murphy*, No. 12 Civ. 3297 (PGG), 2018 U.S. Dist. LEXIS 231115 (S.D.N.Y. Sep. 21, 2018) ........................................................................................................................ 41

*Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) .................................................... passim

*Ekukpe v. Santiago*, 823 F. App'x 25 (2d Cir. 2020) .................................................. 37

*Farghaly v. City of New York*, No. 16-cv-6660 (NG)(ST), 2021 U.S. Dist. LEXIS 177593 (E.D.N.Y. Sept. 17, 2021) ................................... 27, 30, 33, 34

*Figueroa v. Mazza*, 825 F.3d 89 (2d Cir. 2016) ............................................. 36, 37, 38

*Graham v. Connor*, 490 U.S. 386 (1989) ................................................................... 27

*Green v. City of New York*, 465 F.3d 65 (2d Cir. 2006) .......................................... 40, 42

*Harlow v. Fitzgerald*, 457 U.S. 800 (1982) ............................................................... 44

*Hightower v. Nassau County Sheriff's Department*, 325 F. Supp. 2d 199 (E.D.N.Y. 2004) ........................................................ 46, 47

*In re State Police Litig.*, 88 F.3d 111 (2d Cir. 1996) .................................................. 44

*J.H. v. City of Mount Vernon*, No. 18-CV-4399 (CS), 2019 U.S. Dist. LEXIS 64692 (S.D.N.Y. Apr. 15, 2019) ......................................... 42

*Jean-Laurent v. Wilkinson*, 540 F. Supp. 2d 501 (S.D.N.Y. 2008) ............................. 37

*Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) ...................................... 35, 36

*Jeffreys v. Rossi*, 275 F. Supp. 2d 463 (S.D.N.Y. 2003) ............................................. 35

*Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246 (2d Cir. 2001) ..................... 45

*Jones v. Treubig*, 963 F.3d 214 (2d Cir. 2020) ..................................................... 39, 45

*Ketcham v. City of Mount Vernon*, 992 F.3d 144 (2d Cir. 2021)......................................29, 30, 32

*Kingsley v. Hendrickson*, 576 U.S. 389 (2015)..............................................................26, 27, 28

*Leckie v. City of New York*, No. 18-CV-3917 (RRM) (LB),
2021 U.S. Dist. LEXIS 5165 (E.D.N.Y. Jan. 11, 2021) ...................................31, 39, 46

*Lennox v. Miller*, 968 F.3d 150 (2020) ........................................................................... 32

*Maxwell v. City of New York*, 380 F.3d 106 (2d Cir. 2004)........................................... 30

*McLaurin v. New Rochelle Police Officers*, 373 F. Supp. 2d 285 (S.D.N.Y. 2005)................... 37

*Merzon v. County of Suffolk*, 767 F. Supp. 432 (E.D.N.Y. 1991).................................. 26

*Moffitt v. Town of Brookfield*, 950 F.2d 880 (2d Cir. 1991) ....................................... 35

*O'Neill v. Krzeminski*, 839 F.2d 9 (2d Cir. 1988) ........................................................ 37

*Pastre v. Weber*, 717 F. Supp. 992 (S.D.N.Y. 1989)..................................................... 42

*Phelan v. Sullivan*, 541 F. App'x 21 (2d Cir. 2013) .................................................... 31

*Poe v. Leonard*, 282 F.3d 123 (2d Cir. 2002) .............................................................. 27

*Portillo v. Webb*, No. 16 Civ. 4731 (VEC) (GWG),
2022 U.S. Dist. LEXIS 114671 (S.D.N.Y. June 29, 2022).........................39, 45, 46

*Posr v. Doherty*, 944 F.2d 91 (2d Cir. 1991) ............................................................... 39

*Ricciuti v. New York City Transit Auth.*, 124 F.3d 123 (2d Cir. 1997)........................ 35

*Robison v. Via*, 821 F.2d 913 (2d Cir. 1987) ............................................................... 30

*Rosario v. City of New York*, No. 18 Civ. 4023 (LGS),
2019 U.S. Dist. LEXIS 159771 (S.D.N.Y. Sept. 16, 2019).................................... 42

*Skorupski v. County of Suffolk*, 652 F. Supp. 690 (E.D.N.Y. 1987)............................ 35

*Tardif v. City of New York*, 991 F.3d 394 (2d Cir. 2021) ...................................... 39, 41

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ............................ 26

*Terebesi v. Torreso*, 764 F.3d 217 (2d Cir. 2014) ................................................. 39, 45

*Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72 (2d Cir. 2015)................... 26, 27

*Woods v. City of New York*, No. 14-5866 (FB),
2016 U.S. Dist. LEXIS 147659 (E.D.N.Y. Oct. 25, 2016)................................. 31, 32

*Wright v. Smith*, 21 F.3d 496 (2d Cir. 1994)................................................................ 35

iv

*Zachary v. City of Newburgh*, No. 13 CV 5737 (VB),
 2016 U.S. Dist. LEXIS 97247 (S.D.N.Y. July 25, 2016) ...................................................... 35

## **<u>Statutes</u>**

N.Y. Penal Law § 35.30 ................................................................................................. 41

## **<u>Rules</u>**

Fed. R. Evid. 404 ........................................................................................................ 43

<u>**PROPOSED FINDINGS OF FACT**</u>

**I.      The October 14, 2016, Assault**

1.      On October 14, 2016, Plaintiff Sydney Hart was an inmate at the Suffolk County

Riverhead Correctional Facility ("Riverhead") **Trial Tr. 18:6-14 (Hart).**

2.      Ms. Hart was at Riverhead because she was unable to pay bail set in a

then-pending criminal case, which was later dismissed., **Trial Tr. 18:15-24, 112:6-11 (Hart).**

Ms. Hart has never been convicted of a crime.  **Trial Tr. 18:25-19:1 (Hart).**

3.      On October 14, Ms. Hart went to court and was informed that she was going to be

released on her own recognizance ("ROR'ed").  **Trial Tr. 31:5-32:6 (Hart).**

4.      At approximately 3:49 PM, Ms. Hart was escorted back to the jail by non-party

Officer Andrew Alberto ("Officer Alberto").  **Trial Tr. 172:6-9 (Alberto); Pl. Ex. 1, South-**

**East Corr. (IPC016) at 15.49.32-15.50.05; Pl. Ex 2, Sta Visitors (IPC007) at 15.50.00-**

**15.50.32.**

5.      At no point on October 14 did Officer Alberto physically touch Ms. Hart.  **Trial**

**Tr. 202:7-9 (Alberto).**

6.      Ms. Hart was handcuffed at all relevant times.  **Trial Tr. 38:8-18 (Hart).**

7.      At approximately 3:50 PM, Ms. Hart and Officer Alberto turned left and entered

an area known as the "medical corridor," where they walked past Defendant Kellie Burghardt

("Investigator Burghardt").  **Trial Tr. 35:18-25, 70:12-22 (Hart); 172:6-12, 195:17-25**

**(Alberto); 242 (Burghardt); Pl. Ex 2, Sta Visitors (IPC007) at 15.50.00-15.50.32.**

8.      Investigator Burghardt worked out of an office in Riverhead, in a plainclothes

assignment, and was responsible for investigating security incidents in the jail, such as fights,

contraband, and drug overdoses. **Trial Tr. 233-235 (Burghardt).**

9.      At the time Ms. Hart walked past her in the hallway, Investigator Burghardt was speaking to another Riverhead employee, Robin Campo.  **Trial Tr. 274 (Burghardt).**

10.     Also at that time, Investigator Burghardt was holding a bag containing property that a person from outside of the jail had brought to be delivered to an inmate at the jail.  **Trial Tr. 278 (Burghardt).**

11.     Investigator Burghardt's responsibility at that time was to search the bag of property for contraband.  **Trial Tr. 278 (Burghardt).**

12.     Investigator Burghardt testified that the contraband for which she was meant to search the bag of property could "[a]bsolutely" include "a dangerous item," including a weapon or a deadly narcotic substance.  **Trial Tr. 278-279 (Burghardt).**

13.     As she walked past Investigator Burghardt, Ms. Hart made a comment to Investigator Burghardt, stating in substance that Ms. Hart was being released on recognizance and that anyone could get ROR'ed on account of the bad employees at the facility.  **Trial Tr. at 35:11-36:4, 72:3-11 (Hart).**

14.     The video recording of this interaction shows Ms. Hart and Officer Alberto walking through the medical corridor in the direction of the North Lobby.  **Pl. Ex. 4, Medical Corridor (IPC011) at 15:50:30-15:50:46; Trial Tr. 242, 248 (Burghardt).**

15.     Ms. Hart testified that, knowing she would soon be released, she was "rubbing it in" because she was upset with Investigator Burghardt for what Ms. Hart perceived as "transphobic behavior," including by commenting on Ms. Hart's supposedly "husky male voice" and telling Ms. Hart she had "no right" to compare herself to a woman (Investigator Burghardt) because she (Ms. Hart) was not a "real woman." **Trial Tr. at 22:4-17, 22:18-23:17, 108:2-109:1 (Hart).**

16.     While speaking to Investigator Burghardt, Ms. Hart was walking past Investigator Burghardt, in the direction of the North Lobby and away from Investigator Burghardt. **Pl. Ex. 3, Back Visit Gate (IPC013) at 15:50:08-15:50:12**.

17.     As she passed Investigator Burghardt, Ms. Hart turned around to face Investigator Burghardt and continued walking, backwards at that point, toward the North Lobby and away from Investigator Burghardt. **Pl. Ex. 3, Back Visit Gate (IPC013) at 15:50:08-15:50:12**.

18.     Investigator Burghardt stepped into the hallway, toward Ms. Hart, and verbally engaged with Ms. Hart. **Trial Tr. 244-247, 283-285 (Burghardt); Pl. Ex. 3, Back Visit Gate (IPC013) at 15:50:12-15:50:13.**   During that verbal exchange, Ms. Hart was walking away from Investigator Burghardt; Investigator Burghardt was walking toward Ms. Hart. **Pl. Ex. 3, Back Visit Gate (IPC013) at 15:50:13-15:50:20**.

19.     Ms. Hart then turned away from Investigator Burghardt and resumed walking, forward, away from Investigator Burghardt. **Pl. Ex. 3, Back Visit Gate (IPC013) at 15:50:21**.

20.     Investigator Burghardt walked toward Ms. Hart and Officer Alberto. **Pl. Ex. 3, Back Visit Gate (IPC013) at 15:50:22**.  As Investigator Burghardt moved toward her, Ms. Hart looked back over her left shoulder toward Investigator Burghardt. ***Id.* at 15:50:12-15:50:22-15:50:23**.

21.     Ms. Hart again turned toward Investigator Burghardt and continued walking backwards while Investigator Burghardt closed the distance between them. **Pl. Ex. 3, Back Visit Gate (IPC013) at 15:50:23-15:50:25**.

22.     Investigator Burghardt reached Ms. Hart and grabbed her in the left arm area. **Pl. Ex. 3, Back Visit Gate (IPC013) at 15:50:26**.

23.     Investigator Burghardt then physically moved Ms. Hart down the hallway.   **Pl. Ex. 4, Medical Corridor (IPC011) at 15:50:30-15:50:46**.  Investigator Burghardt acknowledged that while "moving [Ms. Hart] down the hall," she was "exerting some pressure from [Investigator Burghardt's] hand on [Ms. Hart's] body."  **Trial Tr. at 303 (Burghardt).** Ms. Hart described the physical contact as: "[Investigator Burghardt] grabbed my left arm and she pulled me down, painfully pulled me down the hallway."  **Trial Tr. at 36:13-37:6 (Hart).**

24.     The video recording introduced as evidence as trial depicts Investigator Burghardt appearing agitated as she moved Ms. Hart down the hallway.  **Pl. Ex. 4, Medical Corridor (IPC011) at 15:50:30-15:50:46**.

25.     Officer Alberto never asked Investigator Burghardt for assistance.  **Trial Tr. 176:24-25 (Alberto); Trial Tr. 282 (Burghardt).**

26.     Investigator Burghardt was not assigned to escort duty and it was not her responsibility to escort Ms. Hart.  **Trial Tr. 282-283 (Burghardt).**

27.     Investigator Burghardt understood at the time that "Ms. Hart could have made it safely to her destination that day without [Investigator Burghardt's] escort."  **Trial Tr. 303-304 (Burghardt).**  Indeed, she testified at trial that the elevator operator would generally "have been the one to take Ms. Hart up to the 5th floor" and acknowledged that it "would … have been possible for [her] to let the SERT Officers to take Ms. Hart up to the elevator by herself."  **Trial Tr. 286-287 (Burghardt).**

28.     Ms. Hart was compliant with Burghardt's instructions and gave no physical resistance.  **Trial Tr. 178:12-20, 179:7-180:1, 202:7-9 (Alberto).**

4

29.     No Defendant has alleged that Ms. Hart physically resisted at any time during the relevant events.  **Trial Tr. 179:15-180:1 (Alberto); Trial Tr. 305 (Burghardt); Trial Tr. 359 (Rice); Trial Tr.  373, 376-377 (Edwards); Trial Tr. 405 (Cable).**

30.     Ms. Hart feared for her safety as Investigator Burghardt tightly grabbed Ms. Hart's arm and pushed Ms. Hart along the hallway to the North Lobby. **Trial Tr. 36:12-23, 37:25-38:4, 38:19-39:8, 72:12-15, 73:4-10, 76:3-9 (Hart); Trial Tr. 299-304 (Burghardt).**

31.     At some point before the group reached the North Lobby, Investigator Burghardt released her hold on Ms. Hart.  **Trial Tr. 38:19-25 (Hart).**

32.     In the North Lobby, Investigator Burghardt recruited the then-members of the Sheriff's Emergency Response Team—Defendants Edwards, Cable, Rice, and Kopczynski (collectively, the "SERT Team Officers")—to help her with the "escort."  **Trial Tr. 42:3-43:8, 76:17-23 (Hart); Trial Tr. 263-264 (Burghardt); Trial Tr. 336-337 (Rice); Trial Tr. 368 (Edwards).**

33.     As she moved through the lobby, Investigator Burghardt tossed the bag of inmate property, which she was supposed to be searching for potentially dangerous contraband, on the ground and walked away from it, without transferring custody of the bag to any other person. **Trial Tr. 279-281 (Burghardt)**; **Pl. Ex. 7, North Lobby (IPC026) at 15.50.53-15.51.23.**

34.     During the escort, Ms. Hart stayed "along the red line where inmates are supposed to walk."  **Trial. Tr. 257 (Burghardt).**

35.     Individual Defendants then led Ms. Hart over to the elevator, which was known by Individual Defendants at the time to have no cameras on it.  **Trial Tr. 77:5-23 (Hart); Trial Tr. 268, 308 (Burghardt); Trial Tr. 354 (Rice); Trial Tr. 373-374 (Edwards); Trial Tr. 420 (Cable).**

36.     As they waited for the elevator, and with Officer Alberto then gone, *see* **Trial Tr. 180:7-12, 200:3-18 (Alberto); Trial Tr. 351 (Rice); Trial Tr. 427 (Kopczynski)**, Individual Defendants began violently and intentionally tackling Ms. Hart; yanking her hair, arms, and wrists; and shoving her, including her body against the wall and her face against a glass bulletin board.  *See* **Trial Tr. 43:1-44:24, 123:3-12 (Hart).**

37.     Ms. Hart screamed that she was being assaulted, but no one intervened, and the use of force continued.  *See* **Trial Tr. 43:12-16, 44:16-20 (Hart); 379 (Edwards); 395-396 (Cable).**

38.     Officers in the North Lobby visibly reacted to a commotion near the elevators. *See* **Pl. Ex. 7, North Lobby (IPC026) at 15.51.25-15.51.53**.

39.     When the elevator door opened, Individual Defendants shoved Ms. Hart into the elevator, where there was a white bin inside, but no passengers.  *See* **Trial Tr. 44:25-45:16 (Hart).**

40.     Investigator Burghardt acknowledged that there was no need to hold Plaintiff while she was in the elevator.  **Trial Tr. 269 (Burghardt).**

41.     One or more Individual Defendants threatened Ms. Hart that if she did not "shut up," they would throw her into the bin.  **Trial Tr. 45:8-12 (Hart).**

42.     As the group rode the elevator from the North Lobby to the Fifth Floor Lobby, one or more of the Individual Defendants pushed Ms. Hart towards the back of the elevator and again shoved her, pulled her hair, and yanked her arms and handcuffed wrists.  **Trial Tr. 45:13-48:6, 50:6-9, 63:23-64:1 (Hart); Trial Tr. 343-344, 364 (Rice).**

43.     At no point during the encounter did any Individual Defendant intervene to stop the use of force, despite being in close proximity to Ms. Hart and the other officers in the

elevator, and despite having unobstructed views of Ms. Hart.  *See* **Trial Tr. 48:7-13 (Hart); Trial Tr. 358-359 (Rice).**

44.     Ms. Hart was handcuffed throughout the encounter and never tried to resist against any of the Individual Defendants.  *See* **Trial Tr. 38:8-18, 43:6-8, 44:7-11, 47:20-25, 52:1-9, 77:5-11, 101:2-9, 135:9-11 (Hart); Trial Tr. 179:4-180:1 (Alberto); Trial Tr. 246-247, 274, 303, 305 (Burghardt); Trial Tr. 359 (Rice); Trial Tr. 373, 376-377 (Edwards); Trial Tr. 405 (Cable).**

45.     When questioned by the Court, Officer Kopczynski admitted that "[i]f an inmate is not physically resisting, a corrections officer is not authorized to use force"; nor are they permitted to use force "[i]f an inmate was only resisting verbally."  **Trial Tr. 431 (Kopczynski).**

46.     As the elevator doors opened, the commotion in the elevator grabbed the Fifth Floor Lobby officers' attention immediately, and two seated officers stood up.  **Pl. Ex. 12, 5th Fl Lobby (IPC223) at 15.52.28-15.53.02.**  At the start of the video, these two officers were sitting at their desks and speaking with a third officer who was standing.  *Id.*

47.     As seen on surveillance video of the North Lobby, in the immediate moments *before* the ride, Ms. Hart was walking upright on her own and showed no indication of pain.  *See* **Trial Tr. 33:9-13 (Hart); Trial Tr. 353-354 (Rice); Pl. Ex. 7, North Lobby (IPC026) at 15.50.53-15.51.08.**  Surveillance video of the Fifth Floor Lobby, however, shows a distinct change in Ms. Hart's physical condition as she exited the elevator *after* the ride.  **Pl. Ex. 12, 5th Fl Lobby (IPC223) at 15.52.28-15.53.02.**

48.     Prior to joining Ms. Hart's escort in the North Lobby, the Individual Defendants were not wearing tactical gloves.  When the emerged from the elevator on the Fifth Floor,

however, all four of the SERT Team Officers were wearing tactical gloves.  **Pl. Ex. 12, 5th Fl Lobby (IPC223) at 15.52.28-15.53.02.**

49.     Defendant Edwards was the first to exit the elevator; he looked to his left, looked back into the elevator, and stepped to the side.  **Trial Tr. 342 (Rice); Trial Tr. 372 (Edwards); Trial Tr. 398 (Cable); Pl. Ex. 12, 5th Fl Lobby (IPC223) at 15.52.28-15.52.43.**

50.     The video then shows Ms. Hart (who was still handcuffed) hobbling, doubled over at her waist, and being held up by Defendants Cable and Rice, **Trial Tr. 80:21-81:25 (Hart); Trial Tr. 344, 353 (Rice); Trial Tr. 398-399, 406-407 (Cable)**—all visible signs of injury that are consistent with Ms. Hart's descriptions of the abuse she experienced.  *See* **Trial Tr. 49:22-50:5 (Hart); Pl. Ex. 12, 5th Fl Lobby (IPC223) at 15.52.28-15.53.02.**

51.     After leaving the elevator, Individual Defendants escorted Ms. Hart to a holding cell in the property room.  **Trial Tr. 50:10-16, 80:8-11 (Hart); Trial Tr. 270 (Burghardt); Trial Tr. 340 (Rice); Trial Tr. 373 (Edwards); Trial Tr. 398 (Cable); Trial Tr. 428 (Kopczynski).**

52.     After the SERT Team Officers left, Defendant Burghardt warned Ms. Hart to "never threaten her again" before walking away herself.  **Trial Tr. 50:17-20 (Hart).**

53.     Less than three minutes after escorting Ms. Hart to a holding cell in the property room, Defendants Kopczynski, Edwards and Rice escorted another inmate in a disciplinary uniform without wearing tactical gloves and without touching the inmate or even positioning themselves in close proximity to the inmate.  **Pl. Ex. 4, Medical Corridor (IPC011) at 15.55.20-15.55.45**.

54.     Ms. Hart remained in the holding cell for several minutes before returning to her cellblock.  **Trial Tr. 51:1-6, 53:3-4 (Hart).**

55.     Despite the policy of the Suffolk County Sheriff's Office requiring officers to report and document use of force, including use of force by another officer, **Trial Tr. 304 (Burghardt); Trial Tr. 348 (Rice); Trial Tr. 369-370 (Edwards); Trial Tr. 428-429 (Kopczynski)**, none of the Individual Defendants prepared any such report following this incident.  **Trial Tr. 305 (Burghardt); Trial Tr. 345, 359-360 (Rice); Trial Tr. 370 (Edwards); Trial Tr. 401 (Cable); Trial Tr. 429 (Kopczynski).**  Indeed, Individual Defendants claim that no force at all was used on Ms. Hart.  **Trial Tr. 268-271 (Burghardt); Trial Tr. 339-340, 343 (Rice); Trial Tr. 369-373 (Edwards); Trial Tr. 397-400 (Cable); Trial Tr. 427 (Kopczynski).**

56.     Individual Defendants have described the interaction as a "routine," "common," and "standard" inmate escort, with nothing out of the ordinary.  **Trial Tr. 336-337, 362 (Rice); Trial Tr. 399, 405 (Cable).**

## II.     Ms. Hart's Injuries

57.     During this time, Ms. Hart felt immense pain on her left wrist, which had become injured from being shoved by Individual Defendants.  **Trial Tr. 48:22-49:1 (Hart).**

58.     Concerned that her wrist was sprained or broken, **Trial Tr. 48:23-49:1, 154:9-12, 166:15-21 (Hart)**, she requested medical attention several times.  **Trial Tr. 52:10-14, 155:21-23 (Hart).**

59.     All these requests were disregarded.  **Trial Tr. 52:10-14, 142:11-15, 155:22-23 (Hart).**

60.     Ms. Hart was released from the Riverhead Jail several hours later.  **Trial Tr. 53:3-14 (Hart).**

61.     In addition to injuries to her left wrist, Ms. Hart also suffered a bloody nose, bruising and discoloration on both upper arms, and emotional pain and suffering. **Trial Tr. 46:1-18, 51:5-25, 58:9-61:1 (Hart).**

All of these physical and emotional injuries were proximately caused by Defendants' conduct.  **Trial Tr. 63:11-64:3 (Hart).**

62.     Immediately upon her release from the Riverhead Jail, Ms. Hart drove to several urgent care centers to obtain medical attention, but the facilities were all closed at the time. **Trial Tr. 53:8-54:4 (Hart).**

63.     She was, however, able to visit an urgent care center the following day, where medical professionals took an X-ray of her left wrist and gave her a brace to help stabilize the wrist**.  Trial Tr. 55:1-56:3 (Hart).**  Ms. Hart's medical records reflect a diagnosis of a "hand sprain."  **Pl. Ex. 21 at 2.**

64.     Ms. Hart wore the wrist brace for approximately one to two weeks.  **Trial Tr. 56:2-3, 143:24-144:1 (Hart).**

65.     Several days after the encounter, Ms. Hart noticed and photographed her bruised and discolored arms.  **Trial Tr. 58:9-63:9 (Hart); Pl. Exs. 20A, 20B, 20C.**

## III.   Credibility Findings

### A.    Motives to Lie

#### 1.    Ms. Hart

66.     Ms. Hart has scant motive to lie.  She did not bring this lawsuit in pursuit of a windfall—if she had, she easily could have exaggerated the physical assault and/or her injuries. Instead, she brought this lawsuit to seek justice and to hold Defendants accountable for their unacceptable and unconstitutional behavior.  **Trial Tr. 65:17-21 (Hart)** ("The reason why I filed

the lawsuit is, I want to hold these defendants accountable for their actions.  They were entrusted by the county to safeguard us, the inmates, not to use as a punching bag, not to abuse us in any way, shape or form.").

67.     Ms. Hart's testimony was forthright and candid, even when the facts to which she testified did not cast her in the best light.  For example, Ms. Hart acknowledged that: (a) she has difficulty getting along with other people; (b) she initiated the interaction with Investigator Burghardt on the day of the incident; (c) her intent in speaking to Investigator Burghardt on the day of the incident was to "rub[] it in" that she was being released from custody; (d) some of her past encounters with Investigator Burghardt were without incident; and (e) she was never punched or kicked.  **Trial Tr. at 17:1-11, 21:16-22:3, 91:3-5, 107:22-108:1, 108:6-14 (Hart)**.

### 2.     Defendants

68.     Defendants, on the other hand, have ample motive to lie.  *First*, they could face professional consequences for using excessive force against a person in their custody.  **Trial Tr. 386-387 (Edwards)** ("Q. And you can face professional consequences if you're accused of excessive force?  A. Yes.  Q.  And you can face professional consequences if there's a finding of excessive force made against you?  . . . .  A.  Yes.  Q.  If you were found to have used excessive force against an inmate, you would face professional consequences?  A.  Yes."), **Trial Tr. 408 (Cable)** ("Q.  And you can get in trouble for using excessive force against an inmate?  A. Correct.  Q.  And if there's a finding that you did use excessive force, that could meet serious professional consequences for you?  A.  Correct.  Q.  If that the [*sic*] happened multiple times, there could be more professional consequences?  A.  Sure.").

69.     *Second*, Individual Defendants are more than work acquaintances; they are friends with a motive to cover for one another—to make sure none of them is forced to actually bear the

professional or financial repercussions facing them.  **Trial Tr. 273-274 (Burghardt)** ("Q.  Now, you and the four other individual defendants, you're all friends, correct?  A.  Correct.  Q.  And you're also friends with defendant Cable's brother, James Cable; is that right?  A.  Correct."); *see also* **Trial Tr. 337 (Rice)** (Rice casually referring to Burghardt by her first name: "Q.  When you refer to Kellie, you're referring to Investigator Burghardt?  A.  Investigator Burghardt.  My apologies.").

      **B.**     **Credibility**

          **1.**     **Ms. Hart**

               **a.**     **Ms. Hart's Consistency**

70.     Ms. Hart's story has been consistent from the start.  From the first time she was able to see a doctor, she maintained that she physically assaulted in the Suffolk County Correctional Facility.  **Pl. Trial Ex. 21 at 1** (Excel Urgent Care of Nesconset PLLC medical record, dated October 15, 2016, noting as the "Chief Complaint Examined:  Injured left wrist & 3 rd digit left hand injury while handcuffed in police custody.")

71.     Ms. Hart's injuries are corroborated by contemporaneous photographs.  **Pl. Exs. 20A, 20B, 20C.**

72.     Ms. Hart testified at a 50-h deposition in May and June of 2017.  **Trial Tr. 64:15-23 (Hart).**

73.     Defendants first made videos of the October 14, 2016 incident available to Ms. Hart in early 2019—long after she first testified under oath. **Trial Tr. 65:03-08 (Hart)** ("Q.  And when did you -- when relative to filing the lawsuit did you receive copies of the surveillance videos?  A.  I received them approximately February 2019. . . It was after I filed the lawsuit and after the 50-h deposition in May and June of 2017.").

**b.      Ms. Hart's Forthrightness**

74.      Ms. Hart's testimony was sincere, non-evasive, and forthright.  It is clear from the trial transcript that Ms. Hart was confused and at times frustrated by some of Defense counsel's questions; however, Ms. Hart sought clarifications when she did not understand.  *E.g.*, **Trial Tr. 91:6-20 (Hart)** (Ms. Hart testifying "Please repeat the question" and "I don't understand"); **96:18** ("Clarify please the question.  I don't understand."); **Trial Tr. 117:3 (Hart)** ("I don't understand the question"); **Trial Tr. 117:11-12 (Hart)** ("I don't understand.  I really don't understand what you're asking me.").

75.      Ms. Hart is autistic and had difficulty understanding Defense counsel's questions.  **Trial Tr. 117:21-23 (Hart)** ("But I still don't understand your questions.  I'm autistic.  I don't understand your questions.  They lack clarity.").

76.      That Defense counsel did not like certain answers or the fact that her questions were confusing Ms. Hart does not amount to evasive answering.  **Trial Tr. 94:11-15 (Hart)** (defense counsel asking the Court to "instruct the witness to answer the question" when Plaintiff explained she "really d[id]n't understand what" defense counsel was asking).

77.      Asked about the mental health medications she takes, she answered unhesitatingly, despite the possible stigma.  **Trial Tr. 85:20-22 (Hart)** ("Q.  What medications were you taking on that date?  A.  I was taking Estradiol, fluvoxamine, and Xanax at that point.").

78.      When asked about prior lawsuits, Ms. Hart was again open and non-evasive.  **Trial Tr. 86:2-88:12 (Hart)** (Ms. Hart describing previous lawsuits she brought to vindicate her constitutionally and statutorily protected rights).

### c.    Unavailing Attempts at Impeachment

79.    Defense counsel put much weight on what Ms. Hart may have or may not have said to her treating physician.  **E.g., Trial Tr. 139:14-16 (Hart)** ("Q.  You did tell the doctor that you had nasal congestion, correct?  A.  Maybe my allergies were acting up.  I don't know."). The reality is that Ms. Hart did not write those notes and had no control over what the physician did or did not write down.  **Trial Tr. 140:17-19 (Hart)** (Ms. Hart explaining that she cannot "attest to the accuracy of the notes [the attending physician] put down").  The physician did not testify at trial.  Ms. Hart cannot be faulted for being unable to explain the intent and meaning behind a writing she did not create.

80.    Defendants attempted to impeach Ms. Hart with her deposition testimony that she was not "aware" of whether Investigator Burghardt caused her physical injury before she "met up with the SERT team."  **Trial Tr. 114:12-115:3 (Hart).** That is not inconsistent with her trial testimony, which was that Investigator Burghardt "manhandled" her down the hallway, but that she could not say that she had, at that point, injuries that would have "required immediate medical attention."  **Trial Tr. 114:2-8 (Hart)** ("What I can tell you is that she had manhandled me, grabbed me, pushed me down the hallway, down the hallway, and it felt painful. It hurt. I was in fear for my physical safety").  Moreover, Ms. Hart's trial testimony is consistent with the video footage presented at trial showing the rough manner in which Investigator Burghardt grabbed Ms. Hart's arm.  **Pl. Ex. 4, Medical Corridor (IPC011) at 15.50.27-15.50.48.**

81.    Defense counsel attempted to undermine Ms. Hart's credibility by repeatedly asking her questions that Ms. Hart would have been in no position to answer because she was facing a wall while she was assaulted.  For instance, Defense counsel attempted to impeach Ms. Hart with her deposition testimony that "six or so SERT members" assaulted her.  **Trial Tr.**

14

**133:8-19 (Hart).**  But "six or so" is both consistent with her trial testimony that four SERT members assaulted her, **Trial Tr. 131:15-18 (Hart)** ("Q.  Total number of officers that assaulted you?  A.  Five defendants.  Q.  That would be four men and one woman?  A.  Yes"), and consistent with the fact that Ms. Hart could not see everything that was happening because most of what was happening was beyond her peripheral vision.  **Trial Tr. 97:8-16 (Hart)** ("I saw out of the periphery of my eye people passing as I was yelling, help, I'm being assaulted.  Help me. I could see out of the periphery of my eye people passing by outside the elevator well.").

82.     Defense counsel elicited testimony from Ms. Hart about her prior lawsuits in an apparent attempt to show that Ms. Hart is litigious (and evidently by extension that her claims lack merit). **Trial Tr. 86:2-88:12 (Hart).**  However, as discussed above, Ms. Hart was open and forthright about her prior litigation.  Moreover, it should come as no surprise that Ms. Hart—a disabled, transgender woman—has endured ugly and unlawful discrimination in her life.  The fact that Ms. Hart has in the past been willing to hold people accountable for their actions, and seek justice for herself, has no bearing on the merits of this case.

83.     Defense counsel also tried to undermine Ms. Hart's testimony about a female lieutenant, "Taylor" to attack her credibility.  **Trial Tr. 234-235 (Burghardt).**  Indeed, on cross examination, Investigator Burghardt testified that she was "almost positive" that there was no "female lieutenant correction officer in the facility at the time."  **Trial Tr. 275 (Burghardt).** That attempt failed because (1) there was a female lieutenant who worked at the facility during Ms. Hart's incarceration there, **Pl. Ex. 24, ECF No. 155-2**, and (2) Ms. Hart simply misremembered the lieutenant's name—a reasonable mistaken given the time that has elapsed since the events giving rise to this action and the immateriality of the lieutenant's name.

84.     Defense counsel seemed to harp on immaterial details; for example, whether there were two or three elevators for inmate use.  **Trial Tr. 260 (Burghardt)** (testifying that there are only two elevators for inmate use, not three as Plaintiff had testified).

85.     Defense counsel also adduced much testimony about the presence of non-SERT officers in light blue shirts that are visible in the video.  *E.g.*, **Trial Tr. 91:7-20, 95:16-20, 97:14-19 (Hart); Trial Tr. 251-252, 259 (Burghardt).**  Again, Defendants' motive for doing so is not clear—there is no dispute that only the five Individual Defendants entered the elevator with Ms. Hart—but it seems to have been intended to question Ms. Hart's ability to accurately recall events and/or to suggest that some other, non-party Riverhead employees may have assaulted Ms. Hart, rather than the Individual Defendants.  There is no factual basis for either implication.

### 2.     Defendants

#### a.     Individual Defendants' Evasive and Misleading Answers

86.     Investigator Burghardt worked at the Riverhead Facility for 21 years, **Trial Tr. 233 (Burghardt)**, but could not testify accurately whether there was a female lieutenant who worked at the facility in October of 2016, **Trial Tr. 275 (Burghardt).**  Defense counsel raised this point to impeach Ms. Hart's memory, but eventually stipulated that Investigator Burghardt was mistaken in her belief that no female lieutenant worked at Riverhead.  *See* **Pls. Ex. 24, ECF No. 155-2**.

87.     Investigator Burghardt testified that, at the time she grabbed Ms. Hart, she was not angry, annoyed, or upset.  **Trial Tr. 284 (Burghardt)**.  That testimony is belied by the video footage in which Investigator Burghardt appears to have a visible emotional reaction to what Ms. Hart had said to her.

88.     None of the circumstances Investigator Burghardt described as possible reasons for her to participate in an inmate escort was present.  **Trial Tr. 237 (Burghardt)** (citing language barriers, the belief an inmate had contraband, or if it is an inmate's "first time in the jail and they need guidance"); **Trial Tr. 276 (Burghardt)** (admitting that escorting inmates was not one of her "regular duties").

89.     During her deposition, Investigator Burghardt admitted that she had only escorted inmates "[a] couple of times, if an inmate wasn't feeling well, [she] escorted them down to medical a few times that [she] could remember."  **Trial Tr. 277 (Burghardt).**  This testimony directly contradicts Defendants' claim that she "escorts SCCF inmates several times each week."  **Defs. Proposed Findings of Fact ("Defs. PFOF"), ECF 157-1, ¶ 11.**

### b.     Defendants' Inconsistencies and Illogical Explanations

90.     Investigator Burghardt testified that she did not observe "any part of [Plaintiff's] body bleeding at any time," **Trial Tr. 271 (Burghardt)**, but in the same line of questioning, she admitted that she did not "check the plaintiff for injuries," **Trial Tr. 271 (Burghardt).**

91.     Investigator Burghardt said the reason she interceded, even though Ms. Hart was handcuffed and being escorted by Officer Alberto, was that she "didn't want [the confrontation] to escalate and I didn't think she would stop."  **Trial Tr. 246 (Burghardt).**  But that testimony makes no sense.  There was no other inmate present; the only person with whom any escalation was possible Investigator Burghardt herself—so if Investigator Burghardt's concern really were to avoid escalation, she could have just walked away.  All the more so because, based on the video, there is no point at which Officer Alberto appears to have lost control of the situation. Moreover, even if Ms. Hart had continued talking despite Investigator Burghardt's instruction not to, Investigator Burghardt's testimony still does not explain why she did not leave Ms. Hart

for Officer Alberto to escort.  Officer Alberto could and should have completed the escort by himself—a task of which he was perfectly capable.  Defendants do not claim otherwise.  The evidence presented at trial—the video footage in particular—demonstrates that the more likely reason for Investigator Burghardt's intervention was to *escalate* the situation with Ms. Hart.

92.     Officer Alberto attempted to wave off Investigator Burghardt to de-escalate the situation.  Officer Alberto's assumption as to why he raised his hand to Investigator Burghardt is unlikely when viewed against the video evidence, which shows Officer Alberto attempting to stop Investigator Burghardt from intervening in the escort.  **Trial Tr. 176:18-20 (Alberto)** ("Q. And you don't know what those gestures signified, do you?  A.  No. That's why I'm assuming I said hello."); **Pl. Ex. 3, Back Visit Gate (IPC013) at 15.49.46-15.50.40.**

93.     Investigator Burghardt testified that she was "taking precautions" by asking Officer Rice for assistance escorting Ms. Hart.  **Trial Tr. 264 (Burghardt).**  Even if that were true, however, it does not explain why three additional SERT officers were needed to escort a single, handcuffed, female inmate who never physically resisted any officer.

94.     Again, her explanation does not make sense.  Investigator Burghardt admitted that Ms. Hart was "complaint with [Investigator Burghardt's] directions at the time [she] asked Officer Rice to assist in the escort."  **Trial Tr. 265 (Burghardt).**

95.     Investigator Burghardt also testified that she needed to transport Ms. Hart because "[w]e try not to let the females alone in the elevator with male officers."  **Trial Tr. 286 (Burghardt).**  Investigator Burghardt testified that she "had decided before [she] got to the elevator that [she] w[as] going to take Ms. Hart all the way up to the 5th floor."  ***Id.***

96.     Once again, this explanation directly contradicts other sworn statements from Investigator Burghardt.  For example, at her deposition, she testified that she decided to stay with

18

Ms. Hart only *after* reaching the elevator, and that she did so because of a supposed "outburst" from Ms. Hart. **Trial Tr. 290 (Burghardt).** In fact, Investigator Burghardt's deposition testimony was that she otherwise would "probably" have left Ms. Hart at the elevator. *Id.*

97.     When asked about this contradiction at trial, Investigator Burghardt's implausible explanation was that the "word [she] meant" to use instead of "probably" was "no." **Trial Tr. 290-291 (Burghardt).**

98.     Moreover, Investigator Burghardt's explanation defies logic. She was not intended to play *any* role in Ms. Hart's escort, which makes her claim that her presence on the elevator was necessary incredible on its face. Obviously Ms. Hart could have been returned to her housing area without Investigator Burghardt's participation—which is what would have happened but for Investigator Burghardt's decision to escalate the encounter.

99.     Investigator Burghardt admitted that the video footage shows Ms. Hart "not standing straight up" as she was escorted off the elevator. **Trial Tr. 270 (Burghardt).** She offered no explanation why. **Trial Tr. 270 (Burghardt)** ("Q. Do you know why the plaintiff was not standing straight up at that time? A. No."). The other Individual Defendants' explanation for the dramatic, physical change in Ms. Hart's gait is implausible. Officer Cable testified that Ms. Hart was lilting to the right because he was holding her by the handcuffs, and she is taller than he. *See* **Trial Tr. 406-407 (Cable).** However, Officer Cable was holding Ms. Hart on her left side and Ms. Hart was leaning to the right. *See* **Pl. Ex. 12, 5th Fl Lobby (IPC223) at 15.52.28-15.53.02.** Accordingly, Officer Cable did not cause Ms. Hart to lean to the right—Ms. Hart was leaning to the right due to her injuries and Officer Cable attempted to hold her up from the left.

100.    Defendants' mantra that "nothing happened" on the elevator is belied by the video evidence—which shows a stark difference in both Ms. Hart's appearance and the Individual Defendants' behavior from before the elevator ride to after—as well as the fact that all four SERT officers put on tactical gloves at some point between the North Lobby and the fifth floor. **Pl. Ex. 12, 5th Fl Lobby (IPC223) at 15.52.28-15.53.02.**  Four officers donning tactical gloves and two officers carrying Ms. Hart off of the elevator are inconsistent with the contention that nothing whatsoever happened on the elevator ride.  So too is the visible reaction of the officers on the fifth floor when the elevator doors opened.  **Pl. Ex. 12, 5th Fl Lobby (IPC223) at 15.52.20-15.53.02.**

101.    Investigator Burghardt testified that Ms. Hart "started screaming" out of nowhere and for reasons no one could explain.  **Trial Tr. 266-267 (Burghardt).**  If Ms. Hart were not being assaulted, then such conduct makes no sense, especially given that Ms. Hart knew she was about to be released from custody.  Rather, only Ms. Hart's account is consistent with the evidence: that Ms. Hart screamed because she was being assaulted, she was scared, and she wanted someone to help.

### c.    Defendants Were Able to Align Their Testimony, and Did

102.    The Individual Defendants are all friends.  **Trial Tr. 273-274 (Burghardt).**

103.    The Individual Defendants took turns sitting in on one another's depositions. **Trial Tr. 346, 429 (Kopczynski)** (Officer Kopczynski attended Officer Rice's deposition) **Trial Tr. 373, 385, 405 (Cable)** (Officer Edwards attended Officer Cable's deposition) **Trial Tr. 405 (Cable)** (Officer Cable attended Officer Burghardt's deposition).  While parties have the right to attend depositions, attorneys typically counsel witnesses to avoid any appearance that they are coordinating their testimony.  None of the Individual Defendants offered any other explanation

for attending other officers' depositions, and each of the officers who attended another Defendant's deposition curiously chose to attend only one.  The Court can and should infer that the officers did this in an effort to align their stories.

104.    The Individual Defendants watched the video together to prepare for their depositions.  **Trial Tr. 349 (Rice).**

105.    Officer Edwards was the most explicit in explaining that his recollection was based, in part, on his "talking to some of [his] fellow defendants."  **Trial Tr. 380 (Edwards).**

106.    Officer Edwards admitted coordinating his testimony with his fellow defendants in the context of testifying at trial that, despite not recalling at his deposition a commotion in the North Lobby, he testified at trial that watching the same video he saw at his deposition refreshed his recollection that the commotion was caused by Ms. Hart.  *See* **Trial Tr. 376-384 (Edwards)**. Officer Edwards' testimony is not credible.  There is nothing on the video that shows the source of the commotion.  **Pl. Ex. 7, North Lobby (IPC026) at 15.51.25 - 15.51.53**.

      **C.**     **Ability to Recall**

107.    The defense opening theme is that Ms. Hart is "a poor historian."  **Trial Tr. 10:16.**  Yet, it is the Individual Defendants that do not independently recall many events critical to this lawsuit.  Ms. Hart is the only witness who had a specific, independent recollection of what happened on October 14, 2016.  **Trial Tr. 220-221 (Alberto)** (Officer Alberto agreeing with the Court that he does not "really have much recollection about this one way or another"); **Trial Tr. 327 (Burghardt)** (when asked about why other SERT officers joined Investigator Burghardt and Officer Rice in the elevator, Investigator Burghardt agreed that she had "no specific recollection of this incident"); **Trial Tr. 347 (Rice)** ("Q.  So your testimony today is based on your review of the video and not based on your independent recollection?  A.  Mostly."); **Trial Tr. 363-364**

**(Rice)** (Officer Rice agreeing that his testimony was based on his "general practice" and "not based upon any specific recollection of this incident"); **Trial Tr. 375 (Edwards)** (Officer Edwards agreeing he has no "independent recollection" of the October 2016 incident); **Trial Tr. 407 (Cable)** ( "I don't even remember that incident . . . ."); **Trial Tr. 429 (Kopczynski)** (Officer Kopczynski testifying that he does not remember the October 2016 incident).

108.     To the extent the Individual Defendants claim to have since remembered the events of October 14, 2016, they incredibly claim that "nothing happened."  **Trial Tr. 269 (Burghardt)** ("Nothing happened."); **Trial Tr. 345 (Rice)** ("Nothing happened"); **Trial Tr. 373 (Edwards)** ("[N]othing happened."); **Trial Tr. 401 (Cable)** ("There was nothing to report."); **Trial Tr. 429 (Kopczynski)** ("[N]othing happened.").  That testimony cannot be squared with the documented injuries Ms. Hart sustained, the video footage showing Investigator Burghardt roughly grabbing Ms. Hart by the arm, and subsequent footage showing the four SERT Team Officers holding Ms. Hart upright as they take her off an elevator.  In other words, the physical evidence makes clear that something, in fact, did happen on October 14, 2016.  The Individual Defendants assaulted Ms. Hart.

109.     Individual Defendants' claim that no force was used and that "nothing happened" is belied by objective evidence in the record, including video evidence.  As seen on surveillance video of the North Lobby, in the immediate moments *before* the ride, Ms. Hart was walking upright on her own and showed no indication of pain.  **Trial Tr. 353-354 (Rice); Pl. Ex. 7, North Lobby (IPC026) at 15.50.53-15.51.08.**  Surveillance video of the Fifth Floor Lobby, however, shows a drastic change in Ms. Hart's physical condition as she exited the elevator *after* the ride.  **Pl. Ex. 12, 5th Fl Lobby (IPC223) at 15.52.28-15.53.02.**

110.    At the start of the video, two officers were sitting at their desks and speaking with a third officer who was standing. **Trial Tr. 344 (Rice).**  As the elevator doors opened, the commotion in the elevator grabbed the Fifth Floor Lobby officers' attention immediately, and the two seated officers stood up.  This utterly belies Individual Defendants' insistence that nothing happened on the elevator.

111.    Despite the policy of the Suffolk County Sheriff's Office requiring officers to report and document use of force, including use of force by another officer, **Trial Tr. 304 (Burghardt); Trial Tr. 348 (Rice); Trial Tr. 369-370 (Edwards); Trial Tr. 428-429 (Kopczynski)**, none of the Individual Defendants prepared any such report following this incident, **Trial Tr. 305 (Burghardt); Trial Tr. 345, 359-360 (Rice); Trial Tr. 370 (Edwards); Trial Tr. 401 (Cable); Trial Tr. 429 (Kopczynski).**  Indeed, Individual Defendants claim that no force at all was used on Ms. Hart. **Trial Tr. 268-271 (Burghardt); Trial Tr. 339-340, 343 (Rice); Trial Tr. 369-373 (Edwards); Trial Tr. 397-400 (Cable); Trial Tr. 427 (Kopczynski).**

## CONCLUSION

Individual Defendants' inability to recall the events of October 14, 2016, is not persuasive, and they had ample opportunity and motive to align their version of events before trial.  Indeed, incredibly, Officer Edwards made clear that his ability to recall those events, or rather Defendants' version of events, was based on his having spoken to his fellow co-Defendants.  Ms. Hart, on the other hand, has been consistent with the material details of her version of events from the start.  Ms. Hart has testified on three occasions, over the course of years, and Defendants have identified no meaningful inconsistencies in her testimony.  Defendants, on the other hand, directly contradicted themselves numerous times.  In addition, only Ms. Hart testified before seeing the video recordings of the incident.  Each of the Individual

Defendants testified about the events only after watching the video recordings.  By a wide margin, it is more likely than not that Ms. Hart's version of events—the only version consistent across time and corroborated by video evidence—is the accurate retelling.

## MEMORANDUM OF LAW

### PRELIMINARY STATEMENT

In October of 2016, Ms. Hart was detained in the Suffolk County Correctional Facility in Riverhead, New York.  Indeed, she had been incarcerated there for the prior thirteen months solely because she was unable to pay bail.  She was not an "unhappy customer."  **Trial Tr. 13:6-8.**  Rather, she had not been convicted of any crime and was presumed innocent.  On October 14, a court ordered that Suffolk County release Ms. Hart.  That same day, on her way back through the jail and on her way to release, Ms. Hart made a comment to Investigator Burghardt that rubbed Investigator Burghardt the wrong way.  Ms. Hart did not challenge Investigator Burghardt to fight; she did not threaten Investigator Burghardt in any way. However, Investigator Burghardt took exception to the perceived disrespect and challenge to authority in Ms. Hart's comment.  So, rather than let it go, Investigator Burghardt immediately and violently grabbed Ms. Hart by the arm, and, over the escorting officer's objections, took over an escort that was not her responsibility.  Investigator Burghardt rallied Defendants Cable, Edward, Rice, and Kopczynski to her side and brought Ms. Hart to an elevator well that jail officials knew was outside the view of any of the facility's surveillance cameras.  There, Individual Defendants took their last opportunity prior to Ms. Hart's release to teach her a lesson about respect and began assaulting her.  Once in the elevator, Defendants Cable, Edward, Rice, and Kopczynski (the "SERT Team Officers") continued the assault.  The SERT Team Officers were happy to help Investigator Burghardt punish the perceived challenge to her authority—the Individual Defendants are all friends, after all, and that fact gave them all the more reason to stand behind the Blue Wall of Silence afterwards, all agreeing to claim that "nothing happened." But something *did* happen, and physical evidence—photographs and video footage—proves it.

Defendants assaulted Ms. Hart without justification and violated Ms. Hart's constitutional right to be free from the use of excessive force.

## LEGAL STANDARDS

The plaintiff bears the burden of proving all the elements of a § 1983 claim and any pendent state law claims by a preponderance of the evidence. *Merzon v. County of Suffolk*, 767 F. Supp. 432, 444 (E.D.N.Y. 1991) (citation omitted). The preponderance standard requires proof that a fact at issue is "more likely than not" true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 329 (2007) (emphasis omitted). "In other words, a preponderance of the evidence means such evidence as, when considered and compared with that opposed to it, has more convincing force, and produces in th[e] Court's mind the belief that what is sought to be proved is more likely true than not true." *Merzon*, 767 F. Supp. at 444-45. In determining whether a fact in issue has been proved by a preponderance of the evidence, "the Court may consider and weigh the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them." *Id.* at 445.

To prevail on a claim brought under 42 U.S.C. § 1983, a plaintiff must prove (1) "the violation of a right secured by the Constitution and laws of the United States," and (2) "the alleged deprivation was committed by a person acting under color of state law."[1] *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87-88 (2d Cir. 2015).

The Due Process Clause of the Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). Pretrial detainees bringing excessive force claims need not prove the defendant's state of mind. *Id.* at 395; *see also Edrei v. Maguire*, 892 F.3d 525, 534 (2d Cir.

---

1. The parties have stipulated that all Individual Defendants "were acting under color of state law" "[a]t all relevant times." (Proposed Joint Pretrial Order, ECF No. 104, at 5.)

26

2018).  Rather, they "must show only that the force purposely or knowingly used against [them] was objectively unreasonable."  *Kingsley*, 576 U.S. at 396-97.  The "objective reasonableness" standard used in the Fourteenth Amendment context is the same as that used in the Fourth Amendment context and "turns on the 'facts and circumstances of each particular case.'"  *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)); *see also Farghaly v. City of New York*, No. 16-cv-6660 (NG)(ST), 2021 U.S. Dist. LEXIS 177593, at *22 (E.D.N.Y. Sept. 17, 2021).[2]

## ARGUMENT

## I.   Individual Defendants Violated Sydney Hart's Fourteenth Amendment Right to Be Free from the Use of Excessive Force

To prevail on a claim brought under 42 U.S.C. § 1983, a plaintiff must prove (1) "the violation of a right secured by the Constitution and laws of the United States," and (2) "the alleged deprivation was committed by a person acting under color of state law."  *Vega*, 801 F.3d at 87-88.

The Due Process Clause of the Fourteenth Amendment "protects a pretrial detainee from the use of excessive force that amounts to punishment."  *Kingsley*, 576 U.S. at 397.  Pretrial detainees bringing excessive force claims need not prove the defendant's state of mind.  *Id.* at 395; *see also Edrei*, 892 F.3d at 534.  Rather, they "must show only that the force purposely or knowingly used against [them] was objectively unreasonable."  *Kingsley*, 576 U.S. at 396-97.  In determining whether, "from 'the perspective of a reasonable officer on the scene,'"

---

2.    Given that the objective reasonableness framework is the same whether the excessive force claim is brought under the Fourteenth Amendment or the Fourth Amendment, Fourth Amendment cases are instructive here. *See Poe v. Leonard*, 282 F.3d 123, 137 (2d Cir. 2002) ("Although the Fourth Amendment cases are not on all fours with [plaintiff's] claim under the Fourteenth Amendment, they are instructive . . . ."); *see also Edrei*, 892 F.3d at 542 n.5 (rejecting defendants' argument that Fourth Amendment cases "cannot establish the law for Fourteenth Amendment purposes," and finding this argument to be "inconsistent with the practice of the Supreme Court and th[e Second] Circuit, both of which cross-pollinate between Fourth, Eighth, and Fourteenth Amendment contexts" (collecting cases)).

the use of force was objectively reasonable, a factfinder may consider the following non-exhaustive list of factors: (1) "the relationship between the need for the use of force and the amount of force used," (2) "the extent of the plaintiff's injury," (3) "any effort made by the officer to temper or to limit the amount of force," (4) "the severity of the security problem at issue," (5) "the threat reasonably perceived by the officer," and (6) "whether the plaintiff was actively resisting" (the "*Kingsley* factors"). *Edrei*, 892 F.3d at 534 (quoting *Kingsley*, 576 U.S. at 397).

Ms. Hart meets her burden in asserting a § 1983 claim for excessive force against all Individual Defendants.

**A.    Individual Defendants Used Excessive Force on Sydney Hart**

The first element of § 1983 claims—that Individual Defendants violated Ms. Hart's constitutional right—is satisfied by a preponderance of the evidence.  Consideration of the *Kingsley* factors weighs heavily in favor of a finding that the use of force against Ms. Hart was excessive and unreasonable when: (1) Defendant Burghardt tightly grabbed Ms. Hart's arm and pushed Ms. Hart along the hallway of the jail; and (2) the SERT Team Officers, at Investigator Burghardt's behest, deliberately tackled Ms. Hart, slammed her against the wall, shoved her face against a glass bulletin board with enough violence to cause her nose to bleed, pulled her hair, and yanked her arms and wrists—all while Ms. Hart was handcuffed and offering no resistance. Additionally, contrary to their argument otherwise, Defendants have no valid defense in their untrue claim that Ms. Hart's injuries were *de minimis*.

In their Post-Trial Memorandum of Law, Defendants finally seem to acknowledge the weakness of their position that "nothing happened."  As a result, they now attempt to raise other, equally unsuccessful arguments.  For example, they argue that a *de minimis* injury cannot

form the basis of a Section 1983 excessive force claim.  *See* Defs. Post-Trial Mem. of Law, ECF 157, at 7-10.  But of course, that argument is based on a line of cases that has been explicitly rejected by the Second Circuit.  *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 150-51 (2d Cir. 2021) (rejecting a "line of district court cases holding that while a plaintiff's … injuries 'need not be severe or permanent,' they 'must be more than merely de minimis' to survive a motion for summary judgment" and observing that "[a]ny such holding would . . . grant a windfall to officers who commit misconduct but could escape liability based upon the hardiness of their victims").  Similarly, Defendants now seem to raise—for the first time—the idea that even if Ms. Hart was assaulted, she cannot identify who was involved.  **Defs. PFOF ¶ 39.** This argument is equally unavailing:   Ms. Hart testified clearly about who was involved, and all five of the individual defendants agree that they were with Ms. Hart before, during, and after the elevator ride.  **Pl. Proposed Findings of Fact ("Pl. PFOF") ¶¶ 22-23, 32, 36, 42, 49-52, 55-56.**  There is no evidence that anybody else was involved.

### 1.    There Was No Need for Individual Defendants to Use Any Force Against Sydney Hart

The first *Kingsley* factor—the relationship between the need for the use of force and the amount of force used—plainly points in Ms. Hart's favor.  It is undisputed that Ms. Hart was handcuffed throughout her interaction with Individual Defendants, and that she put up no resistance to any of the officers**.  Pl. PFOF ¶¶ 6, 28-29, 44.**  Individual Defendants have described the interaction as a "routine," "common," and "standard" inmate escort, with nothing out of the ordinary.  **Pl. PFOF ¶ 56.**  Rather than try to justify the amount of force that they used on Ms. Hart, Individual Defendants claim that no force at all was used.  **Pl. PFOF ¶¶ 55, 107-108, 110.**   The reason for this is because no one filed a use of force report, and Defendants chose instead to deny any force was used.  **Pl. PFOF ¶¶ 55, 110.**  Video and other credible evidence

shows that force was used against` Ms. Hart and that the force was unjustified.  *See, e.g.*, Pl.

PFOF ¶¶ 22-23, 28-30, 38, 46-47, 50, 108-109.  *See Farghaly*, 2021 U.S. Dist. LEXIS 177593, at

*23 (finding that "a reasonable jury could find that the force used against [plaintiff] was

excessive" under first *Kingsley* factor because that jury could conclude that traffic agent was the

first to physically use force against plaintiff); *Edrei*, 892 F.3d at 537 (finding need for force at

protest to be low, where video confirmed that demonstrators were non-violent and there was

robust police presence monitoring the crowd").

### 2.    The Limited Extent of Ms. Hart's Injuries Does Not Preclude Her Excessive Force Claim

Turning to the second *Kingsley* factor—the extent of Ms. Hart's injuries—"an

injury need not be severe or permanent to maintain a claim that the force used was objectively

unreasonable." *Farghaly*, 2021 U.S. Dist. LEXIS 177593, at *24 (citing *Maxwell v. City of New

York*, 380 F.3d 106, 108 (2d Cir. 2004); *see also Ketcham*, 992 F.3d at 150 (a plaintiff's

excessive force claim does not necessarily fail "merely because the injuries were minor even

where the force was unreasonable"); *Robison v. Via*, 821 F.2d 913, 924 (2d Cir. 1987) ("If the

force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted

were not permanent or severe.").  As the Second Circuit has observed, holding that a plaintiff

cannot establish her excessive force claim because her injuries were minor even where the force

was unreasonable "would grant a windfall to officers who commit misconduct but could escape

liability based upon the hardiness of their victims." *Ketcham*, 992 F.3d at 150-51.

Here, Individual Defendants' use of force throughout the encounter was plainly

unreasonable under the circumstances, regardless of whether Ms. Hart suffered lasting physical

injuries.  After just a brief verbal exchange, Investigator Burghardt painfully grabbed Ms. Hart's

arm and dragged her down the jail hallway.  Incensed by Ms. Hart's comment, Investigator

Burghardt then enlisted the SERT Team Officers to manhandle Ms. Hart by and inside the unmonitored elevator.  As evidenced by the photographs of Ms. Hart's arms shortly after the incident, Ms. Hart suffered bruising and discoloration from the assault.  **Pl. PFOF ¶¶ 65, 71.**

In other cases with similar fact patterns, courts have concluded that a plaintiff may recover damages even where the injuries inflicted were not permanent or severe.  For example, in *Woods v. City of New York*, No. 14-5866 (FB), 2016 U.S. Dist. LEXIS 147659 (E.D.N.Y. Oct. 25, 2016), the court found, after a bench trial, that the defendant's striking of the plaintiff's head was "objectively unreasonable and, therefore, excessive," where the defendant struck the plaintiff for insulting the defendant's mother, and the plaintiff suffered headaches as a result.  *Id.* at *2, *4, *9 & n.3.  The court noted that it:

> is mindful that [the defendant officer] is not an inanimate object and it is understandable that as a human being with emotions and feelings she would take umbrage at [the plaintiff's] admitted inappropriate and inexcusable offensive language, obviously spoken in the heat of anger.  But, as difficult as it might be to control her emotions, as a trained law enforcement officer she simply could not strike [the plaintiff].

*Id.* at *9 (citing *Brown v. City of New York*, 798 F.3d 94, 101 n.10 (2d Cir. 2015) (noting that officers' subjective provocation by "abusive language" did not justify use of force)).  *See also, e.g.*, *Phelan v. Sullivan*, 541 F. App'x 21, 24-25 (2d Cir. 2013) (finding it was error to rule as matter of law that *de minimis* injuries rendered use of force constitutional, where plaintiff was forcibly thrown to floor and several officers placed their feet and knees to his back and twisted his arms behind his back); *Leckie v. City of New York*, No. 18-CV-3917 (RRM) (LB), 2021 U.S. Dist. LEXIS 5165, at *9, *17-18 (E.D.N.Y. Jan. 11, 2021) (concluding that reasonable jury could find that correction captain used excessive force on plaintiff by inciting homophobic attack on him by several other pretrial detainees, where attack lasted one to four minutes and resulted in bloody nose, bruises, and bumps to plaintiff's head and arms).

31

Regardless of the extent of Ms. Hart's injuries, "the infliction of harm against a restrained and unresisting [pretrial detainee] is excessive force." *Ketcham*, 992 F.3d at 151; *see also Lennox v. Miller*, 968 F.3d 150, 157 (2020) (observing that "it is impermissible to use significant force against a restrained [individual] who is not actively resisting" and that "this is true despite differences in the precise method by which that force was conveyed"); *Woods*, 2016 U.S. Dist. LEXIS 147659, at *9 & n.3 (finding that striking of plaintiff's head was "objectively unreasonable and, therefore, excessive," where plaintiff "posed no threat to officer safety and was not resisting the . . . officers' demands"); *Alhovsky v. Ryan*, 658 F. Supp. 2d 526, 537-38 (S.D.N.Y. 2009) (finding that slamming of plaintiff's head into window constituted excessive force if, as witness testified, plaintiff was on his knees and in handcuffs, and that it was "of no moment that plaintiff did not suffer any serious physical injury as a result"). As such, from the dragging of Ms. Hart down the facility hallway; to the shoving, tackling, and dragging outside the elevator; to the continued assault inside the elevator; the evidence plainly demonstrates that Individual Defendants violated Ms. Hart's rights by using excessive force.

### 3. Individual Defendants Made No Effort to Temper or Limit the Amount of Force

Turning to the third *Kingsley* factor—whether Individual Defendants made any effort "to temper or to limit the amount of force"—a preponderance of the evidence demonstrates that Individual Defendants made no such effort. Individual Defendants attacked Ms. Hart even though she was handcuffed and compliant. **Pl. PFOF ¶¶ 6, 29, 44.** They continued to attack her even as she screamed that she was being assaulted. **Pl. PFOF ¶ 37.** Other than threatening Ms. Hart that they would throw her into a bin in the elevator if she did not "shut up," **Pl. PFOF ¶ 41,** there is no suggestion that any Individual Defendant issued a warning to Ms. Hart before attacking her. Nor is there any suggestion that any Individual Defendant tried to defuse the

situation or stop the use of force.  To the contrary, Individual Defendants *escalated* the situation, from Investigator Burghardt grabbing and dragging Ms. Hart simply for making a comment Investigator Burghardt disliked; to Investigator Burghardt recruiting four other officers to help her punish Ms. Hart; and to the SERT Team Officers ganging up on Ms. Hart by and in the elevator and tackling her "like they were part of a football team."  **Pl. PFOF ¶¶ 15, 22-23, 30, 32, 36-37, 42; Trial Tr. 44:5-12 (Hart).**  In fact, Investigator Burghardt had no reason to be involved in the situation *at all*; any force used was therefore a direct result of her intentional choices to intervene in Officer Alberto's routine escort of Ms. Hart and to ignore regular practice by refusing to wait for the elevator with an operator to return and safely transport Ms. Hart.  **Pl. PFOF ¶¶ 26-27.**  Accordingly, this factor weighs in favor of Ms. Hart.  *See Farghaly*, 2021 U.S. Dist. LEXIS 177593, at *25 (finding no evidence that traffic agent attempted to temper or limit amount of force used, where, according to plaintiff, agent issued no warning prior to striking plaintiff and did not walk away after situation began to escalate); *Edrei*, 892 F.3d at 538 (finding third *Kingsley* factor to be in plaintiff's favor where there was neither any audible warning nor any visible attempt to move plaintiffs out of street).

### 4.     Sydney Hart Posed No Security Threat

As to the fourth and fifth *Kingsley* factors—"the severity of the security problem at issue" and "the threat reasonably perceived by the officer"—the evidence amply shows that Ms. Hart posed no threat whatsoever.  As Individual Defendants testified, Ms. Hart never resisted or attacked any of the officers.  **Pl. PFOF ¶¶ 28-29, 44.**  Far from claiming any security problem, Individual Defendants described their interaction with Ms. Hart as an ordinary inmate escort.  **Pl. PFOF ¶ 56.**  However, the video evidence shows what a "standard" escort of a disciplinary inmate looks like—no use of force, no touching at all is required.  **Pl. PFOF ¶ 53.**

If anyone felt a threat to their safety, it was *Ms. Hart*, not Individual Defendants.  At the time of the incident, Ms. Hart was a pretrial detainee under the care and custody of Riverhead Jail staff members, including Individual Defendants.  She was handcuffed throughout the encounter and surrounded by officers and other correctional staff.  Under these circumstances, she had no ability to resist against Individual Defendants, even if she tried, which she did not.  Given the clear power dynamic, Ms. Hart feared for her safety and those fears were borne out by Defendants' unconstitutional conduct.  **Pl. PFOF ¶¶ 30, 36-37, 41-42.**

As such, Defendants have not—and cannot—point to any evidence that Ms. Hart posed any security or threat warranting the excessive level of force they used.  *See Edrei*, 892 F.3d at 537 (finding that the "'severity of the security problem' was minimal" and "the 'threat reasonably perceived by officers' was negligible," given video footage confirming that demonstrators were nonviolent and there were numerous officers on scene to keep protestors in check (citation omitted)); *Farghaly*, 2021 U.S. Dist. LEXIS 177593, at *23 (finding that reasonable jury could find that degree of force used was disproportionate, given plaintiff's testimony that traffic agent struck him when he "posed no threat to the safety of [the agent] or anyone else in the area").

### 5.    Sydney Hart Never Resisted

Finally, it is undisputed that Ms. Hart never resisted during the encounter.  There was therefore no reasonable explanation for Individual Defendants to use *any* force, let alone the amount they did.  *See Edrei*, 892 F.3d at 537-38 (finding no indication that plaintiffs were actively resisting, given their prompt compliance with police's order to move to sidewalks, and noting that this factor weighed in favor of plaintiffs).

### B.   All Individual Defendants Were Personally Involved in the Excessive Force

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)).  "A police officer is personally involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so."  *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003), *aff'd sub nom.*, *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005) (citing *Ricciuti v. New York City Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997)); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) ("It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.").

"A plaintiff need not establish who, among a group of officers, directly participated in the attack and who failed to intervene."  *Jeffreys*, 275 F. Supp. 2d at 474 (collecting cases); *see also Skorupski v. County of Suffolk*, 652 F. Supp. 690, 694 (E.D.N.Y. 1987) (rejecting defendants' argument that they were entitled to summary judgment because plaintiff could not specify which officer struck him, and finding that all officers were potentially liable because of affirmative duty to intervene).  "This is especially true where the acts complained of by the plaintiff, if true . . . are likely to have prevented plaintiff from identifying which . . . defendant officers specifically engaged in the bad acts."  *Zachary v. City of Newburgh*, No. 13 CV 5737 (VB), 2016 U.S. Dist. LEXIS 97247, at *20 (S.D.N.Y. July 25, 2016) (citation omitted).

Here, regardless of whether Ms. Hart can distinguish between the Individual Defendants who directly participated in the attack and those who failed to intervene, ample evidence demonstrates that all the Individual Defendants were in the vicinity of the attack and are therefore liable. **Pl. PFOF ¶¶ 22-23, 32, 36, 42, 49-52, 55-56.** *See, e.g.*, *Jeffreys*, 275 F. Supp. 2d at 475 (finding that plaintiff's "inability to identify which officers did what to him is not dispositive," given undisputed evidence that defendants were either located inside classroom or in doorway or hallway outside of classroom where excessive force was used).

### 1. Individual Defendants Directly Participated in the Use of Excessive Force

All the Individual Defendants directly participated in the attack of Ms. Hart on October 14, 2016. Specifically, as noted above, Investigator Burghardt used excessive force when she tightly grabbed Ms. Hart's arm and dragged her down the hallway, and the SERT Team Officers continued the use of excessive force when they attacked her by and inside the elevator. **Pl. PFOF ¶¶ 22-23, 32, 36, 42, 49-52, 55-56.**

### 2. Individual Defendants Failed to Intervene to Prevent, Mitigate, or Stop the Use of Excessive Force

Even assuming, *arguendo*, that any Individual Defendant did not directly participate in the use of force on Ms. Hart, any such Individual Defendant who was at the scene and witnessed it is liable for failing to intervene to prevent, mitigate and/or cease the unlawful force. "A police officer is under a duty to intercede and prevent fellow officers from subjecting a[n individual] to excessive force, and may be held liable for his failure to do so if he observes the use of force and has sufficient time to act to prevent it." *Figueroa v. Mazza*, 825 F.3d 89, 106 (2d Cir. 2016) (citation omitted)). Officers can be held liable under § 1983 where "(1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and

(3) the officer does not take reasonable steps to intervene." *Jean-Laurent v. Wilkinson*, 540 F.

Supp. 2d 501, 512 (S.D.N.Y. 2008) (citing *O'Neill v. Krzeminski*, 839 F.2d 9, 11-12 (2d Cir.

1988); *McLaurin v. New Rochelle Police Officers*, 373 F. Supp. 2d 285, 395 (S.D.N.Y. 2005)).

The evidence demonstrates that all such elements are met here, and that any Individual

Defendant who did not directly participate in the use of excessive force is nonetheless liable by

failing to intervene despite having an affirmative duty and opportunity to do so.

### a.  Individual Defendants Had a Realistic Opportunity to Intervene

Whether an officer had a realistic chance to intercede is a fact-specific inquiry

that turns on factors such as "the number of officers present," "their relative placement," and

"the assault's duration." *Figueroa*, 825 F.3d at 107.  Here, all five Individual Defendants were

present and in close proximity to each other by the time they escorted Ms. Hart to the elevator

cages.  Once the elevator arrived, all five Individual Defendants entered the small confines of the

elevator with Ms. Hart and were no more than a few feet away from her. **Pl. PFOF ¶¶ 39-42, 49-**

**50.**

Because all Individual Defendants were by the elevator cages and inside the

elevator, were the only officers present in the elevator, and were within a few feet of one another

and Ms. Hart throughout the elevator ride, they were all close enough, and therefore obligated, to

intercede in the other officers' use of unlawful force.  *See Ekukpe v. Santiago*, 823 F. App'x 25,

32 (2d Cir. 2020) (affirming denial of officer's motion for judgment as a matter of law, where

officer "himself testified that he was in very close proximity to [plaintiff]" and "identifie[d] no

'obstacles that might have hindered [his] ability to intercede'" (third alteration in original)

(citation omitted)); *Figueroa*, 825 F.3d at 108 (vacating judgment for officers on failure-to-

intervene claims where plaintiff testified he was sitting in back of police car and officers were

sitting in front, and "[n]othing in the record suggest[ed] that [officers] would have for any reason found it difficult to reach into the backseat, exit the vehicle to assist [plaintiff], or communicate with the officer who committed the assault").

Finally, Individual Defendants had ample opportunity to intercede, given that excessive force was used on Ms. Hart at various stages throughout the encounter, including as the group waited for the elevator and then as it moved from the first to the fifth floor.  *See Figueroa*, 825 F.3d at 108 (concluding that reasonable juror could find that officers failed to intervene, "even assuming that the assault lasted less than twenty seconds"); *Anderson*, 17 F.3d at 558 (remanding for new trial where district court failed to instruct jury on duty to intervene, despite there being evidence that officer had several opportunities to intervene, including evidence that officer "had time to assess the situation because he was nearby," and "had an opportunity to stop the fighting").

> **b.      A Reasonable Person in Individual Defendants' Position Would Know That Sydney Hart's Constitutional Rights Were Being Violated**

A reasonable person in Individual Defendants' shoes would have known that the other officers were violating Ms. Hart's constitutional right to be free from the use of excessive force.  As a general matter, all the Individual Defendants were trained on the use of force**. Trial Tr. 295-297, 299-304 (Burghardt); Trial Tr. 345, 347-348, 354 (Rice); Trial Tr. 376, 386 (Edwards); Trial Tr. 428-431 (Kopczynski).**  Each one of them was therefore well versed on the constitutional right at issue.  And as discussed below, *see infra* Section IV, it was clearly established at the time of the incident that officers cannot deliberately inflict pain on a restrained and unresisting individual, cannot incite violence against a pretrial detainee, and have an affirmative duty to intervene to stop the infringement of constitutional rights by other officers in their presence.  *See Portillo v. Webb*, No. 16 Civ. 4731 (VEC) (GWG), 2022 U.S. Dist. LEXIS

114671, at *42 (S.D.N.Y. June 29, 2022) (citing *Jones v. Treubig*, 963 F.3d 214, 225 (2d Cir.

2020); *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014)); *Leckie*, 2021 U.S. Dist. LEXIS

5165, at *19. The gratuitous use of force in this particular case was also evident, given, *inter

alia*, Ms. Hart's screams for help, **Pl. PFOF ¶ 37**. Under these circumstances, no reasonable

officer could have been mistaken that Individual Defendants were applying unconstitutional,

excessive force on Ms. Hart.

### 3. Individual Defendants Did Not Take Reasonable Steps to Intervene

Finally, all Individual Defendants deny that any force was used against Ms. Hart

and none claims to have taken any steps to intervene.

## II. Individual Defendants Assaulted and Battered Sydney Hart

New York law defines assault as "an intentional placing of another person in fear

of imminent harmful or offensive contact" and battery as "an intentional wrongful physical

contact with another person without consent." *Tardif v. City of New York*, 991 F.3d 394, 410 (2d

Cir. 2021) (quoting *Charkhy v. Altman*, 252 A.D.2d 413, 414 (1st Dep't 1998)). "The elements

of New York assault and battery and Section 1983 excessive force claims are 'substantially

identical.'" *Id.* (citation omitted); *see also Posr v. Doherty*, 944 F.2d 91, 95 (2d Cir. 1991)

(noting that other than color of law requirement, "the essential elements" of § 1983 excessive

force claim and state law assault and battery claims are "substantially identical"). Accordingly,

just as Ms. Hart satisfies her burden in asserting her § 1983 claim, she meets her burden of

proving her assault and battery claims.

### A. Individual Defendants Committed Assault Against Sydney Hart

Individual Defendants assaulted Ms. Hart during their encounter on October 14,

2016. Individual Defendants, by their words and actions, placed Ms. Hart in fear of imminent

harmful or offensive physical contact.  After Ms. Hart encountered Investigator Burghardt in the hallway and made a comment about her pending release, Investigator Burghardt took over the inmate escort of Ms. Hart and aggressively dragged her along the hallway to the North Lobby, causing Ms. Hart to fear for her physical safety.  **Pl. PFOF ¶ 30.**  Once at the North Lobby, Investigator Burghardt assembled the SERT Team Officers to continue the use of unreasonable force, thereby placing Ms. Hart in fear of yet more harmful contact.  **Pl. PFOF ¶¶ 36-37, 39.** During the attack, the SERT Team Officers also verbally threatened Ms. Hart, including by telling her that they would throw her inside a bin if she did not "shut up."  **Pl. PFOF ¶ 41.**

Individual Defendants placed Ms. Hart in fear intentionally, as evidenced by Investigator Burghardt's unnecessary intercession in Ms. Hart's escort and the fact that Officer Alberto (the actual escorting officer) never requested any assistance; Investigator Burghardt's recruitment of four SERT Team Officers to help her with the "escort"; Individual Defendants' harmful contact to Ms. Hart in the elevator, where they knew there were no surveillance cameras; Individual Defendants' continued aggressiveness despite facing no danger or physical resistance from Ms. Hart; and Investigator Burghardt's parting warning to Ms. Hart at the property room.  **Pl. PFOF ¶¶ 22-23, 25, 32, 35-44, 52.**

Finally, as with Ms. Hart's § 1983 excessive force claim, Ms. Hart's injuries need not be severe.  *See Green v. City of New York*, 465 F.3d 65, 86 (2d Cir. 2006) ("[S]eriousness of the injury does not appear to be an element of a New York assault claim[.]").

### B.    Individual Defendants Committed Battery Against Sydney Hart

The evidence likewise proves that Individual Defendants battered Ms. Hart. Credible evidence, including surveillance video and photographs, demonstrates that Individual Defendants made physical contact with Ms. Hart when Investigator Burghardt painfully grabbed

Ms. Hart's arm and the SERT Team Officers tackled, shoved, and yanked Ms. Hart by and inside the elevator.  **Pl. PFOF ¶¶ 23, 36, 39, 42.**  There is no question that Ms. Hart did not consent to the contact, and the evidence shows it was intentional.  Moreover, the evidence demonstrates Defendants wanted to punish Ms. Hart for what they perceived as her mouthing off to Investigator Burghardt.  **Pl. PFOF ¶¶ 15-23, 52.**

### C.    Individual Defendants Are Not Entitled to the Justification Defense

To state an assault or battery claim in the law enforcement context, a plaintiff must also demonstrate that the officer's conduct "was not reasonable within the meaning of the New York statute concerning justification of law enforcement's use of force in the course of their duties." *Tardif*, 991 F.3d at 410 (citation omitted).  That statute, Section 35.30 of the New York Penal Law, provides in pertinent part that:

> A police officer . . . may use physical force when and to the extent he or she reasonably believes such to be necessary to effect [an] arrest, or to prevent [an] escape from custody, or in self-defense or to defend a third person from what he or she reasonably believes to be the use or imminent use of physical force.

*Id.* (alterations in original) (quoting N.Y. Penal Law § 35.30(1)).  Section 35.30 "requires the jury to conduct precisely the same analysis as does the reasonableness standard" under the Fourth and Fourteenth Amendments.  *Id.* (citation omitted).

Here, Individual Defendants' actions were unreasonable within the meaning of New York's justification statute for the same reasons they were unreasonable under the Fourteenth Amendment standard: (1) Ms. Hart was handcuffed throughout the encounter and put up no resistance to any of the officers, (2) Individual Defendants made no effort to temper or limit the amount of force and instead repeatedly escalated the situation, and (3) Ms. Hart posed no security problem or threat.  *See Davis v. Murphy*, No. 12 Civ. 3297 (PGG), 2018 U.S. Dist. LEXIS 231115, at *24-26, *33 (S.D.N.Y. Sep. 21, 2018) (granting plaintiff summary judgment

on battery claim for same reasons it granted summary judgment on § 1983 excessive force claim, where plaintiff did not pose a threat and officers' use of force served no legitimate purpose); *Pastre v. Weber*, 717 F. Supp. 992, 995 n.5 (S.D.N.Y. 1989) (finding at bench trial that officer used excessive force against plaintiff, and ruling thereafter that officer's conduct "further constitutes an assault and battery under state law").

### D. Defendant Suffolk County Is Liable, as Individual Defendants' Employer, for Individual Defendants' Assault and Battery of Sydney Hart

"A[n] . . . employer . . . is liable for intentional torts, such as assault and battery, committed by its employees provided that the tort is committed within the scope of the plaintiff's employment." *Green*, 465 F.3d at 86 (citation omitted); *see also J.H. v. City of Mount Vernon*, No. 18-CV-4399 (CS), 2019 U.S. Dist. LEXIS 64692, at *16-17 (S.D.N.Y. Apr. 15, 2019) ("New York courts have held municipalities liable under a theory of *respondeat superior* for . . . assault and battery claims." (citation omitted)).  "A 'municipality may be held vicariously liable for the conduct of a member of its police department if the officer was engaged in the performance of police business.'" *Rosario v. City of New York*, No. 18 Civ. 4023 (LGS), 2019 U.S. Dist. LEXIS 159771, at *24 (S.D.N.Y. Sept. 16, 2019) (citation omitted).

Defendant Suffolk County cannot dispute that Individual Defendants were acting within the scope of their employment by the County when they had their interaction with Ms. Hart.  At the time of the incident, all the Individual Defendants were employed by and acting within the scope of their employment as members of the Suffolk County Sheriff's Office.  **Pl. PFOF ¶¶ 8, 32.**  As such, because the evidence shows that Individual Defendants assaulted and battered Ms. Hart, the County is also liable under the doctrine of *respondeat superior*.

**III.    The Chiaro Incident Lends Credence to Ms. Hart's Version of Events and Undermines the Individual Defendants' Credibility**

The Court should take into account the *Chiaro* allegations for a few different reasons.  *First*, the allegations Mr. Chiaro made are strikingly similar to what happened to Ms. Hart.  They do not know each other, Mr. Chiaro and Ms. Hart.  They did not collude to come up with the same story that the same corrections officers assaulted them in the same way.

That is not propensity evidence.  Ms. Hart is not arguing that Defendants have a natural tendency, an inclination, to act in a certain way.  Ms. Hart is not arguing that the Court should believe her version of events because the Individual Defendants have the propensity to be assaultive.  Rather, Ms. Hart's argument is that the prior bad acts Mr. Chiaro alleges demonstrate a common intent and plan to use areas of the Riverhead facility shielded from surveillance to assault inmates as a form of punishment when a CO feels slighted, among other reasons explained in previous submissions on this issue.  **ECF No. 126.**

Rule 404(b) explicitly permits using prior bad act evidence to show a common plan.  Fed. R. Evid. 404(b)(2) ("This evidence may be admissible for another purpose, such as proving . . . plan . . . .").  The purposes, other than propensity, that Rule 404(b) lists are not even an exclusive list; they are just examples of permissible uses.  *Id.* (using the phrase, "such as," implying a non-exhaustive list).  Plaintiff has catalogued all of the non-propensity reasons why Mr. Chiaro's allegations are admissible**, ECF No. 126**, and will not repeat them here.

*Second*, Mr. Chiaro's allegations show, most favorably to Defendants, that they are cagey; that they are hiding *something*.  (The least favorable thing to say is just that they are liars.)  Mr. Chiaro's allegations only came to light after Ms. Hart herself came across them, despite requesting in discovery that Defendants identify any prior "complaint histories[] and/or lawsuits."  **ECF No. 139.**  Mr. Chiaro's allegations never came up—not in paper discovery and

not during depositions.  However, during trial, Defendants Cable and Kopczynski admitted to having provided written statements to internal affairs regarding the Chiaro incident.  **Trial Tr. 476:1-4, 481:24-482:1 (Cable); Trial Tr. 491:3-6 (Kopczynski).**  Defendant Burghardt admitted that she was interviewed as part of internal affairs' investigation.  **Trial Tr. 470:12-16 (Burghardt).**  It strains credulity to think that all of these officers would forget these sorts of serious allegations, which, if true, would carry serious professional consequences.

Defendants were not entirely truthful about whether anyone else had alleged or complained of assault by them before, and the Court should therefore seriously doubt whether Defendants were being entirely truthful when they testified on the stand and denied assaulting Ms. Hart in the same camera-less elevator well in which certain of the Individual Defendants allegedly assaulted Mr. Chiaro.  **Trial Tr. 495:21-25 (Kopczynski).**

## IV.    Individual Defendants Are Not Entitled to Qualified Immunity

Police officers are not entitled to qualified immunity where (1) "the official violated a statutory or constitutional right," and (2) "the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The burden of establishing entitlement to qualified immunity is on each Individual Defendant.  *In re State Police Litig.*, 88 F.3d 111, 123 (2d Cir. 1996).  Here, Individual Defendants cannot rebut that they violated Ms. Hart's constitutional rights and that such rights were clearly established.

Turning to the first prong of the qualified immunity inquiry, the evidence amply shows that Individual Defendants violated Ms. Hart's Fourteenth Amendment rights.  As set forth above, they violated her right to be free from the use of excessive force by, among other things, tackling her, yanking her arms and wrists, and slamming her body against a wall and her

44

face against a glass bulletin board, all with no legal justification.  **Pl. PFOF ¶¶ 15, 22-23, 30, 32, 36-37, 42.**

As to the second prong, there is no question that Ms. Hart's right to be free from the use of excessive force was clearly established at the time of Individual Defendants' misconduct.  "[T]he Supreme Court has counseled that for qualified immunity to be inoperative, the right in question cannot be too abstract but rather must be 'clearly established' in a more particularized, and hence a more relevant sense.'"  *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 253 (2d Cir. 2001) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The Second Circuit has held, however, "that for claims based on intentionally tortious harmful conduct employed in the absence of any legitimate government interest, the requisite degree of particularity is lessened." *Id.*  "Such conduct in the 'non-seizure, non-prisoner context' by any government actor under any circumstances is unjustifiable and, therefore, no additional situation-specific 'contouring' of the right to be free of excessive force is required." *Id.*

By October 2016, the right to be free of excessive force in the "non-seizure, non-prisoner context" was "sufficiently concrete to put [Individual Defendants] on notice that [they] could not use intentionally harmful force in the absence of a legitimate and discernible government aim." *Id.*  It was likewise clearly established that "law enforcement may not use 'significant force' against a restrained individual who is not resisting and poses no threat to officers," *Portillo*, 2022 U.S. Dist. LEXIS 114671, at *42 (citing *Jones*, 963 F.3d at 225), and that "law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence," *id.* (quoting *Terebesi*, 764 F.3d at 243).  Finally, "[i]t is well established that pre-trial detainees cannot be subject to punitive force under the Fourteenth Amendment, and no reasonable official

45

would believe that inciting violence against a . . . detainee . . . falls within the scope of acceptable activity under the Due Process Clause." *Leckie*, 2021 U.S. Dist. LEXIS 5165, at *19.

Accordingly, Individual Defendants cannot avail themselves of the protection of qualified immunity. *See Portillo*, 2022 U.S. Dist. LEXIS 114671, at *42-43 (denying defendants' request for summary judgment on basis of qualified immunity, given that no reasonably competent officer in October 2015 would believe "that repeatedly shoving an injured, shackled, non-resisting detainee to the ground was lawful," or "that standing idle while a fellow officer repeatedly shoves an injured, shackled, non-resisting detainee to the ground was lawful").

## V.    Sydney Hart Is Entitled to Compensatory and Punitive Damages and Attorneys' Fees and Costs

The credible evidence demonstrates that Defendants' unlawful conduct caused Ms. Hart to suffer physical, mental, and emotional injuries that are properly compensated under § 1983.  In addition, the credible evidence demonstrates that Individual Defendants acted in a wanton, willful, and/or malicious manner in their use of force against Ms. Hart, including their acts of violently and intentionally tackling her; yanking her arms, wrists, and hair; and shoving her, including her body against a wall and her face against a glass bulletin board.

Plaintiff asks for compensatory damages of no less than $100,000 dollars for physical and emotional injuries, and no less than $75,000 in punitive damages against each Individual Defendant for their wanton use of force.

Ms. Hart's compensatory damages are at least as serious as the plaintiff's in *Hightower v. Nassau County Sheriff's Department*, 325 F. Supp. 2d 199 (E.D.N.Y. 2004).  In that case, the plaintiff suffered "soft tissue injuries, consisting of bruises and contusions," which were "non-permanent injuries."  325 F. Supp. 2d at 209.  The plaintiff did not have any testimony from a "doctor or therapist" to "substantiate the extent or the severity of his emotional distress."

46

*Id.* The court offered the plaintiff the choice between a new trial on damages or to accept a reduction in the jury award, taking physical damages from $150,000 to $65,000, and the emotional distress award from $65,000 to $35,000—a reduction from $215,000 down to $100,000. *Id.* The court left undisturbed the plaintiff's $65,000 punitive damages award. *Id.* at 203, 209.

      A $75,000 punitive damages award is also consistent with *Anderson v. Aparicio*, 25 F. Supp. 3d 303 (E.D.N.Y. 2014). There, the plaintiff alleged that "deputies punched him in the face and on the back of the head repeatedly and slammed him onto the ground, causing injuries" that were corroborated by photographs and medical records. 25 F. Supp. 3d at 306-07. The court upheld a jury award of $20,000 in compensatory damages and $75,000 in punitive damages. The $75,000 punitive damages award was appropriate because, as here, the defendants' made a "a disturbing demonstration of unprovoked violence by a law enforcement officer." *Id.* at 311.

      Accordingly, Ms. Hart is entitled to recover: (1) compensatory damages from Defendants for physical injury, conscious pain and suffering, mental anguish, and emotional distress; (2) punitive damages from Individual Defendants to punish their wanton and malicious conduct and deter them and others from engaging in similar behavior in the future; and (3) attorneys' fees and costs.

## CONCLUSION

      For the foregoing reasons, the Court should find in favor of Ms. Hart, award her compensatory and punitive damages, enter judgment accordingly, and grant any further remedy this Court finds just.

Dated:  July 14, 2023
        New York, New York

By: _____

David B. Shanies
Deborah I. Francois
Tristan M. Ellis
Eleanor C. Davis
SHANIES LAW OFFICE LLC
110 West 40th Street, 10th Floor
New York, New York 10018
(212) 951-1710 (Tel)
(212) 951-1350 (Fax)
david@shanieslaw.com
deborah@shanieslaw.com
tristan@shanieslaw.com

Nickolas J. Reck
SPEARS & IMES LLP
767 Third Avenue
New York, New York 10017
(212) 213-6996 (Tel)
(212) 213-0849 (Fax)
nreck@spearsimes.com

*Attorneys for Plaintiff Sydney Hart*