**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------X
SYDNEY HART,

                Plaintiff,

                                                  **MEMORANDUM OF DECISION**
                                                  **WITH FINDINGS OF FACT AND**
         v.                                       **CONCLUSIONS OF LAW**

                                                 17-CV-05067 (LGD)

SUFFOLK COUNTY, KELLIE BURGHARDT,
KENNETH KOPCZYNSKI, JAMIE RICE,
MAXWELL EDWARDS, and TIMOTHY CABLE,

                             Defendants.
--------------------------------------------------------X

**LEE G. DUNST**, Magistrate Judge:

        Plaintiff Sydney Hart ("Plaintiff") currently asserts claims against Suffolk County (the

"County") and County employees Kellie Burghardt ("Burghardt"), Kenneth Kopczynski

("Kopczynski"), Jamie Rice ("Rice), Maxwell Edwards ("Edwards"), and Timothy Cable ("Cable,"

and together with Burghardt, Kopczynski, Rice, and Edwards "Individual Defendants") alleging that

the Individual Defendants used excessive force, assaulted, and battered Plaintiff on October 14, 2016

while Plaintiff was incarcerated at the Suffolk County Correctional Facility ("SCCF") in Riverhead,

New York.  *See* Electronic Case File Number ("ECF No.") 60 (Plaintiff's operative pleading, the

Third Amended Complaint).[1]

        On June 23, 2022, this case was assigned to the undersigned for all purposes on consent of the

parties.  ECF No. 98.  On November 17, 2022, the parties consented to a bench trial.  ECF No. 107.

The Court first held the bench trial on two consecutive days (December 6, 2022 and December 7,

---

[1] Previously named defendants Suffolk County Sheriff's Office, Suffolk County Police Department, Sergeant
Michael Alfano, Police Officer James McQuade, Riverhead Correctional Facility, Corrections Officer Patricia Burkhardt,
and various John Doe defendants have been dismissed over time.  *See* ECF No. 1 (original complaint that names these
defendants); ECF No. 60 (Plaintiff's operative pleading, which excludes most of these defendants); ECF No. 77 (order
granting stipulation to dismiss these remaining defendants).

2022) and, as a result of various motions raised for the first time by Plaintiff during the trial, concluded the trial on May 15, 2023.  Now, based on the Court's evaluation of the trial testimony—including the credibility of the witnesses—and the evidence introduced at trial, the Court issues the below findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure ("FRCP") 52(a)(1).

Despite the extensive arguments over the six years since Plaintiff filed the initial complaint, this ultimately is a straightforward and simple case.  Virtually all of the key interactions between Plaintiff and the Individual Defendants in the SCCF on October 14, 2016 are videotaped (albeit with no audio) and were introduced into evidence at trial.  In the Court's opinion, there cannot be any real dispute about most of the events on October 14, 2016, as the Court can see it in the video footage. However, the parties strongly disagree about what happened inside the SCCF for the brief portion that occurred outside camera range (and thus where there is no video)—specifically just outside the elevators in the north lobby of the SCCF (the so-called "sally port") and then inside the elevator going from the north lobby to the fifth floor of the SCCF.  Simply put, Plaintiff contends that she was subject to excessive force by the Individual Defendants, who dispute using any force (let alone excessive force) at any time against Plaintiff.  For the reasons set forth herein, the Court concludes that Plaintiff has failed to meet her burden of proving her claims by a preponderance of the evidence. Before reaching that analysis, the undersigned will memorialize and supplement the rulings previously made on the record during the March 14, 2023 conference with the parties that adjudicated two motions filed by Plaintiff in the midst of the bench trial.

## I.    PLAINTIFF'S MOTIONS

Certain background information is necessary to address the two motions filed by Plaintiff during the bench trial in this case.

On November 30, 2015, Christopher Chiaro (who was proceeding *pro se*) filed a complaint in this district alleging that, while he was incarcerated at the SCCF on November 4, 2014, unspecified SCCF personnel said that they would take Mr. Chiaro for an "elevator ride" before they forced Mr. Chiaro into an elevator and assaulted him (the "Chiaro Allegations").  *See Chiaro v. Suffolk County et al.*, No. 15-cv-6862 (E.D.N.Y.) (the "Chiaro Case") ECF No. 11.  On November 30, 2016, District Judge Sandra J. Feuerstein issued an order that, among other things, (1) directed the Suffolk County Attorney's Office ("SCAO") to identify the John Doe defendants named in the Chiaro Case pursuant to *Valentin v. Dinkins*, 121 F.3d 72, 76 (2d Cir. 1997), and (2) directed the Clerk of the Court to serve that order upon the SCAO.  *See* Chiaro Case ECF No. 12.  On December 22, 2016, the SCAO filed a letter identifying Cable, Kopscynski, and another individual as the persons named in the Chiaro Case as John Doe defendants.  *See* Chiaro Case ECF No. 15.  On December 28, 2016, summonses were issued to Cable and Kopyczynski in the Chiaro Case.  *See* Chiaro Case ECF No. 16.  On January 10, 2017, Judge Feuerstein ordered Mr. Chiaro to show cause why the Chiaro Case should not be dismissed for failure to prosecute.  *See* Chiaro Case ECF No. 17.  On January 12, 2017, Cable and Kopzynski were reportedly served at the SCCF with the operative pleading in the Chiaro Case.  *See* Chiaro Case ECF No. 19.  Due to Chiaro's failure to respond to the order to show cause, Judge Feuerstein dismissed the Chiaro case for failure to prosecute on June 7, 2017.  *See* Chiaro Case ECF No. 20.

At no point prior to the start of the bench trial in this action on December 6, 2022 did any party raise anything about the Chiaro Case with the Court.  *See* ECF. No. 128 ¶ 40 (sworn declaration from Plaintiff's counsel stating that "I concluded we had no duty to inform Defendants or the Court before

trial"). In fact, the bench trial proceeded through the first day with no mention of the Chiaro Case. On December 7, 2022, Plaintiff rested her case at the beginning of the trial day. *See* Trial Transcript ("Tr.") at 232. The County and Individual Defendants (together, "Defendants") then put on their case and, during the afternoon testimony, Plaintiff's counsel began to cross examine Cable about allegations made against him in the Chiaro Case. *See id.* at 409. It is undisputed that this was the first time that Plaintiff ever advised the Court about this subject. *See* ECF. No. 128 ¶¶ 41, 46 (sworn declaration from Plaintiff's counsel explaining that he made "the strategic decision" to wait until cross-examination to raise the Chiaro Case). Defense counsel objected to those questions as improperly seeking to show that Cable had a propensity to assault inmates in elevators. *See* Tr. at 410. In response, Plaintiff's counsel (1) asserted that questions about the Chiaro Case were permissible under Federal Rule of Evidence ("FRE") 404(b), (2) stated the Chiaro Case had not previously come up in this matter because defense counsel wrongly failed to disclose it, (3) represented that he learned of the Chiaro Case approximately two weeks before trial, and (4) informed the Court that he had spoken with Mr. Chiaro "a few days ago" and that Mr. Chiaro was "willing to testify in this case." *Id.* at 410-14, 417. Defense counsel denied any failure of disclosure. *Id.* at 415. Given those circumstances, the Court prohibited Plaintiff from inquiring further about the Chiaro Case at that time with either Cable or Kopczynski and instructed Plaintiff to file a motion if she desired to use the Chiaro Case or call Mr. Chiaro to testify in this matter. *See id.* at 415-18, 433-41.

On December 8, 2022, Plaintiff filed a motion formally requesting the Court to "permit the questioning of Defendants Cable and Kopczynski about the Chiaro allegations and, if they deny those allegations, allow Plaintiff to call Mr. Chiaro to testify as a rebuttal witness."[2] ECF No. 126 at 9; *see also* ECF No. 127 (opposition thereto). The following day, the Court issued an order confirming that

---

[2] "Plaintiff d[id] not contend the pleadings from *Chiaro* are admissible . . . ." ECF No. 126 at 2 n.1.

the bench trial was suspended as a result of this motion and directing Defendants to disclose any non-privileged documents concerning the Chiaro Case.  ECF No. 132.  After Defendants produced those materials (*see* ECF No. 135), Plaintiff filed a further motion on January 13, 2023, seeking sanctions against Defendants for alleged discovery violations in connection with Defendants' non-disclosure of the Chiaro Case.  ECF No. 139; *see also* ECF No. 141 (opposition thereto).  It is undisputed that Plaintiff did not raise any issues regarding this alleged discovery violation prior to the start of the bench trial on December 6, 2022, even though Plaintiff's counsel had been aware of it for at least several weeks.  *See* ECF. No. 128 ¶¶ 17-20 (sworn declaration from Plaintiff's counsel stating that Plaintiff's counsel discussed among themselves on or about November 10, 2022 whether there were possible discovery violations by Defendants).

During a status conference that lasted approximately one hour on March 14, 2023, the Court orally decided both motions by (1) granting Plaintiff leave to cross examine Cable, Kopczynski, and Burghardt about the Chiaro Allegations; (2) denying Plaintiff's request for leave to call Mr. Chiaro to testify as a rebuttal witness; and (3) denying Plaintiff's request for sanctions against Defendants for alleged discovery violations.  ECF No. 144.  In doing so, the Court informed the parties that the "post-trial written decision will address the aforementioned motions consistent with this minute entry and the Court's related statements on the record."  *Id*.

### A.   Motion To Cross Examine About The Chiaro Case

Plaintiff advanced five arguments for leave to cross examine Cable and Kopczynski about the Chiaro Allegations.  *See* ECF No. 126 at 4-6.  The Court addresses only one of those points here because it is independently sufficient to permit that cross examination.  Plaintiff contends that the Chiaro Allegations bear on Cable and Kopczynski's truthfulness.  *See* ECF No. 126 at 6.  While Plaintiff relies on FRE 404(b) in support of her arguments (*see id.*), "[e]vidence relevant to a witness's

character for truthfulness is governed by Rule 608(b) and not Rule 404(b)."[3] *LeClair v. Raymond*, No. 19-CV-28, 2022 WL 219609, at *5 (N.D.N.Y. Jan. 25, 2022); *see United States v. Zhong*, 26 F.4th 536, 551-55 (2d Cir. 2022) (applying FRE 608(b) to prior act evidence regarding witness's truthfulness after separately applying FRE 404(b) to prior act evidence admitted for other reasons). Under FRE 608(b), "'the court may, on cross-examination,' allow 'specific instances of a witness's conduct' to be 'inquired into if they are probative of the character for truthfulness or untruthfulness' of the witness." *Zhong*, 26 F.4th at 554 (quoting Fed. R. Evid. 608(b)). Such a cross examination must be undertaken on a "good-faith basis." *Hynes v. Coughlin*, 79 F.3d 285, 294 (2d Cir. 1996). Thus, "a party may impeach a witness by inquiring into her prior 'bad acts' that bear on the witness's character for truthfulness so long as the proffering party has a good-faith belief that untruthful act actually occurred." *Martinez v. City of New York*, No. 16-CV-79, 2022 WL 17090267, at *4 (E.D.N.Y. Nov. 18, 2022) (citing Fed. R. Evid. 608(b)). "[T]he court still must balance that probative value against the risk of unfair prejudice to the defendant, pursuant to Rule 403." *United States v. Desposito*, 704 F.3d 221, 233 (2d Cir. 2013).

For purposes of only this evidentiary ruling, the Court concludes that Plaintiff has a good faith basis to allege that Cable and Kopczynski testified untruthfully when they denied recalling any prior excessive force complaints made against them. *See* Tr. 408-09 (Cable's trial testimony); ECF No. 110-9 at 91:13-92:2 (Kopczynski's deposition testimony). Given that the Chiaro Allegations against Cable and Kopczynski regarding an alleged incident in the elevator at the SCCF are similar to Plaintiff's allegations regarding another alleged incident in an elevator at the SCCF, Plaintiff has

---

[3] The "holding that 'challenging the truthfulness of a witness is a permissible "other purpose" under Rule 404(b)' has been 'criticized because Rule 608 is the specific rule applicable to attacks on the truthfulness of a witness.'" *LeClair*, 2022 WL 219609, at *5 (quoting *Cordova v. Hoisington*, No. 11-cv-806, 2014 WL 11842837, at *1 (D.N.M. Jan. 17, 2014) (collecting cases)); *see Serafinn v. Local 722*, 597 F.3d 908, 915 (7th Cir. 2010) (holding that FRE 404(b) permits admission of prior act evidence for certain purposes "other than attacking the witness' general character for truthfulness" as governed by FRE 608); *United States v. Davis*, 183 F.3d 231, 257 n.11 (3d Cir.) ("A few courts have allowed cross-examination about other bad acts under Rule 404(b) to challenge credibility, though we think that the correct view is that such questions are allowable under Rule 608."), *amended in other respect*, 197 F.3d 662 (3d Cir. 1999).

satisfied the requirements of FRE 608(b).  *See Martinez*, 2022 WL 17090267, at *4 (finding plaintiff

had a good faith basis to cross examine a defendant about the falsity of his statement); *Rosales v.*

*Kelly*, No. 07-CV-10554, 2011 WL 5873374, at *2 (S.D.N.Y. Nov. 14, 2011) (allowing plaintiff to

cross examine corrections officer about the officer's prior failure to file an incident report for a use of

force).

The undersigned finds the risk of prejudice is minimal relative to the probative value of this

line of questioning.   "In the context of a bench trial, the possibility of unfair prejudice is remote."

*Picard v. Sage Realty*, No. 20-CV-10057, 2021 WL 5826295, at *4 (S.D.N.Y. Dec. 8, 2021); *see De*

*La Rosa v. 650 Sixth Ave Trevi LLC*, No. 13-CV-7997, 2019 WL 6245408, at *4 (S.D.N.Y. Nov. 22,

2019) (holding that the FRE 403 "balancing test strongly favors admissibility in a bench trial"); *see*

*also BIC Corp. v. Far E. Source Corp.*, 23 F. App'x 36, 39 (2d Cir. 2001) ("[A]dmission of evidence

in a bench trial is rarely ground for reversal, for the trial judge is presumed to be able to exclude

improper inferences from his or her own decisional analysis.").  The cases cited by Defendants to

counter this conclusion, *Phillips v. City of New York*, 871 F.Supp.2d 200, 203 (E.D.N.Y. 2012) and

*Jean-Laurent v. Hennessy*, 840 F.Supp.2d 549, 556 (E.D.N.Y. 2011) (*see* ECF No. 127 at 5), "are

unavailing, because each involved balancing the probative nature of evidence against its prejudicial

impact on a jury, rather than on a judge conducting a bench trial."  *Gerena v. New York State Off. of*

*Mental Health*, No. 11-CV-4450, 2018 WL 11466739, at *14 (E.D.N.Y. Feb. 27, 2018).  Moreover,

> Defendants [came] into trial with a strong upper hand in the number of eyewitnesses
> to the incidents at issue—indeed, Plaintiff is the only eyewitness who is not a
> Correction Officer—any potential attack on [the Individual Defendants'] credibility
> may be diminished by the Defendants' corroborating testimony. Under these
> circumstances, it is in fact Plaintiff who might suffer unfair prejudice should [s]he
> be precluded from pursuing a legitimate avenue—Rule 608(b)—in hopes of making
> a small dent in Defendants' formidable testimonial lineup.

*Rosales*, 2011 WL 5873374, at *2.  Accordingly, the Court granted Plaintiff's request to cross

examine Cable and Kopczynski about the Chiaro Allegations.

Finally, the Court *sua sponte* granted Plaintiff leave to cross examine Burghardt about the Chiaro Allegations given that Burghardt reportedly was interviewed in 2016 in connection with and gave a statement about those allegations.  *See* ECF No. 135-1 at 25, 33 (noting Burghardt's interview and providing a copy of her written statement);  ECF No. 135-2 at 3 (summarizing Burghardt's interview); *Rekor Sys., Inc. v. Loughlin*, No. 19-CV-7767, 2023 WL 1777248, at *4 (S.D.N.Y. Feb. 6, 2023) (allowing cross examination about a topic absent satisfaction of Fed. R. Evid. 608(b) because "this is a bench trial"); *see also Republic of Turk. v. Christie's Inc.*, 425 F. Supp. 3d 204, 221 (S.D.N.Y. 2019) (permitting expert testimony without deciding the motion challenging its sufficiency under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) because "[i]n the context of a bench trial . . . there is not a concern for juror confusion or potential prejudice" (internal quotations omitted)).

### B.      Motion To Allow Mr. Chiaro To Provide Rebuttal Testimony

Plaintiff's request for leave to call Mr. Chiaro as a rebuttal witness if Cable and Kopczynski "deny th[e Chiaro A]llegations" on cross examination (ECF No. 126 at 9) runs afoul of the Federal Rules of Evidence.  Specifically, FRE 608(b) expressly prohibits using "extrinsic evidence . . . to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."  Fed. R. Evid. 608(b).  The Second Circuit has held that FRE 608(b) plainly "bar[s] the admission of . . . testimony[] related to the past conduct of a witness."  *United States v. Ramirez*, 609 F.3d 495, 499 (2d Cir. 2010) (finding rebuttal testimony was wrongly admitted).  Thus, "[w]hen a witness is cross-examined for the purpose of destroying his credibility by proof of specific acts of misconduct not the subject of a conviction, the examiner must be content with the answer.  The examiner may not, over objection, produce independent proof to show the falsity of such an answer."  *United States v. Masino*, 275 F.2d 129, 133 (2d Cir. 1960); *see United States v. Shoreline Motors*, 413 F. App'x 322, 329 (2d Cir. 2011) ("we have recognized that cross-examination is generally the proper

mechanism by which to test an adverse witness's credibility, and the use of extrinsic evidence to further pursue questions posed on cross-examination is generally not permitted."). The Second Circuit in recent years has declined to modify this longstanding rule. *See Ramirez*, 609 F.3d at 499-500 & n.1 (explaining the Court's "reluctan[ce]" to render cross examination testimony subject to the "impeachment by contradiction" exception to Fed. R. Evid. 608(b)); *Shoreline Motors*, 413 F. App'x at 329–30 ("Even if, in an appropriate case, we ought to allow cross-examination testimony to be impeached by extrinsic contradiction, it is unnecessary to announce any such rule today."). Accordingly, Plaintiff's request for leave to call Mr. Chiaro as a rebuttal witness to counter Cable and Kopczynski's anticipated cross examination testimony was denied.[4]

## C.   Motion For Discovery Sanctions

In her motion filed after the start of the bench trial, Plaintiff contends that the County breached its discovery obligations by failing to previously disclose the Chiaro Allegations and should be sanctioned for this alleged misconduct. *See* ECF No. 139 at 1. "Sanctions may be authorized by any of a number of rules or statutory provisions, or may be permissible on the basis of the court's inherent powers." *Sakon v. Andreo*, 119 F.3d 109, 113 (2d Cir. 1997). "[FRCP] 26(g) and 37 'represent the principal enforcement power to punish discovery abuse.'" *Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216, 235-236 (2d Cir. 2020) (quoting Gregory P. Joseph, *Sanctions: The Federal Law of Litigation Abuse* 558-59 (6th ed. 2020)). "Inherent power sanctions are thus not a primary mechanism by which a party can obtain relief for a discovery abuse: They should serve only as a

---

[4] Even if Plaintiff's request to admit rebuttal testimony could comply with FRE 608(b), the undersigned would still deny it as a matter of the Court's "wide discretion in determining whether to permit evidence on rebuttal." *FDIC v. Suna Assocs.*, 80 F.3d 681, 687-88 (2d Cir. 1996) (quoting *United States v. Tejada*, 956 F.2d 1256, 1267 (2d Cir. 1992)); *see United States v. Hiss*, 185 F.2d 822, 832 (2d Cir. 1950) (holding that deciding whether to admit rebuttal testimony is a "matter[] so clearly within the discretion of the judge" that "we think no more need be said . . . ."); *see also Leniart v. Bundy*, No. 3:09-CV-9, 2015 WL 14023725, at *1 (D. Conn. Feb. 17, 2015) (denying motion to present rebuttal evidence given "the general 'practical disadvantages that would result from abandoning the natural order of evidence, including the possible unfairness to an opponent who has justly supposed that the case in chief was the entire case which he had to meet . . . .'" (quoting *Gartner v. Drs. Hosp.*, No. 81-CV-2571, 1984 WL 1188, at *1 (S.D.N.Y. Oct. 24, 1984)) (internal alterations omitted)).

useful backstop against discovery abuses that do not clearly violate [FRCP] 26(g) and 37." *Id*. at 236. For the reasons set forth herein, the undersigned finds sanctions are unwarranted under any of those potential bases for the relief Plaintiff seeks.

       1.   <u>FRCP 37</u>

Under FRCP 37, "[i]f a party fails to provide information or identify a witness as required by [FRCP] 26(a) or (e)," the Court may, on motion and after giving an opportunity to be heard, impose "appropriate sanctions." Fed. R. Civ. P. 37(c)(1).[5] FRCP 26(a) and (e) "concern initial disclosures and the supplementation of those disclosures, or responses to discovery requests or interrogatories." *Beverly Hills Teddy Bear Co. v. Best Brands Consumer Prod., Inc.*, No. 19-CV-3766, 2020 WL 7342724, at *4 (S.D.N.Y. Dec. 11, 2020) (quoting *Williams v. City of New York*, No. 16-CV-4315, 2017 WL 4382283, at *1 (S.D.N.Y. Sept. 29, 2017)). Plaintiff contends that—because Cable and Kopczynski were identified in response to interrogatories concerning parties then named as John Does (ECF No. 128-3 at 2)—the County violated FRCP 26(e) by failing to disclose materials responsive to Plaintiff's discovery request seeking "[a]ll disciplinary records, personnel files, complaint histories, and/or lawsuits, for . . . any John Does identified in the Interrogatory Responses." ECF No. 139 at 3 (quoting ECF No. 128-1 at 7). The Court disagrees with Plaintiff.

A party is obligated to respond to document requests by producing responsive materials that are in its "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). Under this rule, "production may be required" where "a party has access and the practical ability to obtain documents not available to the party seeking them." *Shcherbakovskiy*, 490 F.3d at 138; *see Signify Holding B.V. v. TP-Link Rsch.*

---

[5] That language confers "wide discretion" for imposing sanctions under that rule. *S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 144 (2d Cir. 2010) (quoting *Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 135 (2d Cir. 2007)). A court imposing FRCP 37 sanctions may exercise that discretion after "properly consider[ing] various factors, including '(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of noncompliance.'" *Funk v. Belneftekhim*, 861 F.3d 354, 366 (2d Cir. 2017) (quoting *S. New Eng. Tel.*, 624 F.3d at 144) (internal alteration omitted). The Court need not evaluate those factors here, however, because the undersigned declined to impose sanctions for the reasons explained below.

*Am. Corp.*, No. 21-CV-9472, 2022 WL 3704001, at *2 (S.D.N.Y. Aug. 26, 2022) ("Courts in the

Second Circuit follow the so-called 'practical ability' standard; that is, a party has 'possession,

custody, or control' over a document if it has the practical ability to obtain and produce the

documents." (collecting cases)).

Defense counsel confirmed that there are no disciplinary, personnel, or complaint history

records for Cable and Kopczynski regarding the Chiaro Allegations:

> Sheriff's Office complaint histories include only those IAB[6] investigations of which the
> officer is named as a subject.  IAB did not deem Cable and Kopczynski to be subjects of
> its investigation into Chiaro's complaint.  In fact, no officer was deemed a subject of the
> investigation, as shown by the empty space under the heading of "Subject(s)" in the
> Investigator's Report Log (Exhibit A, Barry Declaration) and the Report of Investigation
> (Exhibit B, Barry Declaration), which states at page 2, "[t]here are no officers named as
> the subject of this investigation."

ECF No. 141 at 3.  Plaintiff "offer[s] no basis to question" that representation.  *Stadtwerke Frankfurt

am Main Holding GmbH v. RWE Trading Americas Inc.*, 813 F. App'x 6, 8 (2d Cir. 2020) (affirming

quash of subpoena based on representation that the subpoena recipient could not obtain the requested

documents).  "Needless to say, there is no basis to impose sanctions for a failure to produce

documents that do not exist."  *Mintz Fraade L. Firm, P.C. v. Brady*, No. 19-CV-10236, 2021 WL

1759003, at *3 (S.D.N.Y. May 4, 2021); *see Shcherbakovskiy*, 490 F.3d at 138 (vacating FRCP 37

sanctions because  "a party is not obliged to produce, at the risk of sanctions, documents that it does

not possess or cannot obtain.").

Defense counsel also represented—with a supporting sworn declaration from the former

SCAO attorney who submitted the letter to Judge Feuerstein in 2016 that identified Cable and

Kopczynski in the Chiaro Case—that the SCAO (1) never appeared as counsel for any defendant in

the Chiaro Case; (2) was not informed that Cable and Kopczynski were substituted into the Chiaro

---

[6] "IAB" refers to "the Suffolk County Sheriff's Office of Professional Standards, formerly known as the Internal
Affairs Bureau."  ECF No. 141 at 3.

Case; (3) was not notified that service in that action was later directed to Cable and Kopczynski; and (4) was therefore unable to inform Cable, Kopczynski, and Plaintiff about the aforementioned developments in the Chiaro Case.  Specifically,

> [The SCAO] was unaware that process was issued [to Cable and Kopczynski] because we were . . . not listed on the docket sheet and thus were not sent the ECF bounces for that case, including the one indicating that they had been served. Resultantly, Court Alert, the office's internal docketing system that automatically captures bounces, had no bounces to capture. As attorneys in this office are instructed to use Court Alert and not PACER to avoid expending limited public funds on PACER fees, we would not have [been] able to locate the bounce reflecting service of process because it was not in Court Alert. Indeed, the absence of a bounce in Court Alert would have erroneously indicated to us process was not issued in the names of Cable and Kopczynski, let alone that it had been served upon them. Needless to say, the County Attorney's Office could not have informed them that Chiaro had actually proceeded to sue them because we were unaware of it.

ECF No. 141 at 4; *see* ECF No. 141-5 (supporting sworn declaration).[7]

In attempting to account for these uncontroverted representations, Plaintiff seeks sanctions for the County's failure to do what Plaintiff did, that is, "identify the Chiaro case by searching the public docket." ECF No. 139 at 5.  However, it "is well-established that discovery need not be required of documents of public record which are equally accessible to all parties." *Krause v. Buffalo & Erie Cty. Workforce Dev. Consortium, Inc.*, 426 F. Supp. 2d 68, 90 (W.D.N.Y. 2005) (quoting *Securities and Exchange Commission v. Samuel H. Sloan & Co.*, 369 F.Supp. 994, 995 (S.D.N.Y. 1973)); *see Shcherbakovskiy*, 490 F.3d at 138 (explaining that document discovery is proper for materials that are "not available to the party seeking them").  All materials filed in the Chiaro Case are "documents [that may be] obtained from this Court's archives" and are "publicly and equally available to all parties. Since Defendants were not required to produce the documents, the predicate for preclusion—violation of [FRCP] 26(a) or (e)—is absent and, in turn, there is no basis for [imposing a sanction] pursuant to

---

[7] Plaintiff's contention that the SCAO "represented the County" in the Chiaro Case (ECF No. 139 at 8) is belied by the docket in that action and the aforementioned sworn declaration submitted by Defendants. *See* ECF No. 141-5.

[FRCP] 37(c)(1)." [8] *Bey v. City of New York*, No. 99-CV- 3873, 2010 WL 3910231, at *4 (S.D.N.Y. Sept. 21, 2010); *see Twelve Sixty LLC v. Extreme Music Libr. Ltd.*, No. 17-CV-1479, 2020 WL 2749708, at *5 (S.D.N.Y. May 26, 2020) (denying motion for sanctions based on failure to produce consent decrees because they "are publicly available documents"); *Norton v. Town of Islip*, No. 04-CV-3079, 2019 WL 4194271, at *9 (E.D.N.Y. Sept. 4, 2019) (similar).

      2.   <u>FRCP 26(g)</u>

FRCP 26(g) requires that "[e]very disclosure under [FRCP] 26(a)(1) or (a)(3) and every discovery request, response, or objection must be signed by at least one attorney of record in the attorney's own name . . . ." Fed. R. Civ. P. 26(g)(1).  That signature certifies in relevant part that "to the best of the person's knowledge, information, and belief formed after a reasonable inquiry" any disclosure is "complete and correct" as well as "consistent with the [Federal Rules of Civil procedure] and warranted by existing law . . . ." *Id*.  "If a certification violates this rule without substantial justification, the court, on motion or on its own, must impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both." Fed. R. Civ. P. 26(g)(3).

Plaintiff's two arguments claiming that the County violated FRCP 26(g) miss the mark.  First, Plaintiff contends that the County's discovery certifications were deficient because the County did not produce the public Chiaro Case filings.  *See* ECF No. 139 at 5.  But as explained above, Defendants were not obligated to produce those materials.  *See Twelve Sixty*, 2020 WL 2749708, at *5; *Norton*, 2019 WL 4194271, at *9; *Bey*, 2010 WL 3910231, at *4.  Second, Plaintiff contends that she also

---

[8] Plaintiff requested that the Court consider "(1) whether the party with control of the evidence had an obligation to timely produce it, (2) whether that party had a culpable state of mind, and (3) whether the withheld documents are relevant to the party's claim or defense . . . ."  ECF No. 139 at 7 (quoting *Beverly Hills Teddy Bear*, 2020 WL 7342724, at *6).  The undersigned need not analyze the second and third factors given that, as explained above, Defendants were under no obligation to produce documents publicly filed in the Chiaro Case or the other requested materials that do not exist.  In addition, the Court rejects Plaintiff's assertion that Defendants "forced [her] into the Hobson's choice of saving the *Chiaro* case for possible impeachment and/or a rebuttal case or not using it at all" because her counsel "only learned of the *Chiaro* case shortly before trial." *Id*. at 2.  Plaintiff "cannot claim to have been blindsided by these matters of public record." *Twelve Sixty*, 2020 WL 2749708, at *5; *see Bey*, 2010 WL 3910231, at *5 (finding plaintiffs "cannot plausibly claim they were sandbag[ged]" with respect to public court records).  Indeed, Plaintiff demonstrated that she "can just as easily obtain the documents on h[er] own absent production by [Defendants]." *Norton*, 2019 WL 4194271, at *9.

"sought a broader category of documents—including documents that are not publicly available. Indeed, the Court directed the County to turn over such nonpublic documents, and it did."  ECF No. 139 at 5 (citing ECF No. 132).  But, again as explained above, it is uncontroverted that there are no documents related to the Chiaro Allegations responsive to Plaintiff's request for "disciplinary records, personnel files, [or] complaint histories . . . *for Defendants*."  *Id*. at 3 (quoting ECF No. 128-1 at 7) (emphasis added).  Defendants' subsequent production of materials concerning the Chiaro Allegations pursuant to the Court's broader directive during the break in the bench trial to produce all "non-privileged documents concerning" the Chiaro Allegations (ECF No. 132) does not undermine that conclusion.[9]

### 3.    Inherent Authority

"A court may sanction a party under its inherent power to deter abuse of the judicial process and prevent a party from perpetrating a fraud on the court."  *Yukos Capital*, 977 F.3d at 235. Critically, "clear and convincing evidence of bad faith is a prerequisite to an award of sanctions under the court's inherent power."  *Id.*  In addition, "the Supreme Court has made clear that courts should impose sanctions pursuant to their inherent authority only in rare circumstances."  *Id*. (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991) ("Because of their very potency, inherent powers must be exercised with restraint and discretion.")).

Plaintiff's motion for sanctions does not seek relief under the Court's inherent authority.  *See generally* ECF No. 139.  Assuming *arguendo* that Plaintiff pursued relief under the Court's inherent sanction authority—and even putting aside that (1) said sanction authority is "not a primary mechanism by which a party can obtain relief for a discovery abuse" and (2) "[i]n the discovery context, [inherent sanction authority] should be exercised with even more restraint than usual"—the

---

[9] As there were no nonpublic documents concerning the Chiaro Allegations responsive to Plaintiff's document request, the undersigned rejects Plaintiff's assertion that "[t]he County also violated [FRCP] 34(b)(2)(C)" by "not stat[ing] that it was withholding any documents in response to RFP No. 3 . . . ."  ECF No. 139 at 6.

undersigned would decline to exercise inherent sanction authority because Defendants and their counsel plainly have not acted in bad faith.[10] *Yukos Capital*, 977 F.3d at 235-36 (affirming refusal to impose sanctions under the Court's inherent authority); *see also Int'l Techs. Mktg., Inc. v. Verint Sys., Ltd.*, 991 F.3d 361, 369 (2d Cir. 2021) (holding that "a district court imposing monetary sanctions under its inherent power" may do so only when "a party advanced a colorless claim and did so for improper reasons").

## II.      FINDINGS OF FACT

### A.      Background

On approximately September 3, 2015, Plaintiff was admitted to the SCCF as a pretrial detainee.  Tr. at 18.  The Individual Defendants were employed at the SCCF during Plaintiff's incarceration.  Burghardt was a "security investigator" who regularly "investigated inmate fights, contraband, drugs, weapons, self-harm, escape risks, [and] visits." *Id*. at 276.  Burghardt also occasionally escorted inmates for the "safety and security of the facility" even though escorting was not one of her "regular" responsibilities. *Id*.  Officers Kopczynski, Rice, Edwards, and Cable were all members of the same Sherriff's Emergency Response Team ("SERT") crew on the date central to this lawsuit: October 14, 2016. *Id*. at 205, 361-62.  The SERT crew regularly escorted inmates who were "not following the rules of the facility" or otherwise wore a "disciplinary" uniform bearing "red and white stripes." *Id*. at 243, 334, 363-64.  Due to earlier issues that arose during her pretrial detention at SCCF, Plaintiff wore that disciplinary uniform and had been assigned to SCCF disciplinary housing. *See, e.g., id*. at 111 (Plaintiff's testimony acknowledging these facts).

---

[10] Finally, the Court notes once again that none of the issues about the Chiaro Allegations or any alleged discovery violations were raised by Plaintiff *prior* to the start of the bench trial, even though Plaintiff's counsel had been aware of this subject for at least several weeks.  *See* ECF. No. 128 ¶ 17 (sworn declaration from Plaintiff's counsel that he learned of the Chiaro Case on November 10, 2022).  In fact, Plaintiff made the "strategic decision" to wait until the testimony of Cable and Kopcynski to raise any issue about the Chiaro Case. *See id.* ¶¶ 41, 46.  Plaintiff's "strategic decision" to say nothing to the Court about the Chiaro Case until well into the bench trial further supports the conclusion that this is not one of the "rare circumstances" that calls for inherent authority sanctions. *Yukos Capital*, 977 F.3d at 235.

Plaintiff—who in November 2009 "transition[ed] from male to female" by undergoing "gender reassignment surgery" that yielded "female genitalia anatomy" on her person—claimed that she was "subjected to transphobic behavior" by various SCCF staff while she was incarcerated at the SCCF. *Id*. at 17, 19; *see also id*. at 19 (detailing that unnamed SCCF staff referred to Plaintiff using "derogatory terms such as he[-]she, it, thing, [and] meatloaf"). Plaintiff testified to two instances in which one defendant, Burghardt, allegedly acted with hostility towards Plaintiff based on the latter's transgender status. First, in approximately September 2016, Burghardt reportedly "ridiculed [Plaintiff] in front of the other inmates" by commenting that Plaintiff has a "husky male voice." *Id*. at 22. Second, in late September or early October 2016, after Plaintiff "reminded" Burghardt that "I have a vagina like her, [and] I [have] breasts [like her]," Burghardt reportedly said that Plaintiff has "no right" to compare herself to Burghardt because only Burghardt is "a real woman." *Id*. at 23. Burghardt denied all these allegations. *Id*. at 275-76. Burghardt testified that she encountered Plaintiff on two occasions prior to October 14, 2016, but both times were unrelated to Plaintiff's gender. According to Burghardt, Plaintiff on those occasions erroneously accused Burghardt of placing Plaintiff in disciplinary housing—and Burghardt responded that she had no role in connection with Plaintiff's assignment to disciplinary housing. *See id*. at 239-40.

**B.     The Events Of October 14, 2016**

Plaintiff, the Individual Defendants, and nonparty former Suffolk County Correctional Officer Andrew Alberto ("Alberto") testified at the bench trial about the events of October 14, 2016. [11] In addition, the parties entered twenty-two exhibits into evidence, including fifteen videos of various locations inside the SCCF. *See* ECF No. 155 (providing the parties' joint exhibit list, which numbered

---

[11] Alberto retired from the SCCF in or about June 2021. *See* Tr at 169.

exhibits 1-16, 18, 20A, 20B, 20C, 21, and 24).[12]  A chronology of that day's key events based on the exhibits and testimony follows.

### 1.    Plaintiff's Court Appearance And Return Therefrom

Plaintiff attended a proceeding in state court in which she "learned [she] was being released on [her] own recognizance" in the criminal case for which she was incarcerated at the SCCF.  Tr. at 32. Plaintiff was not released directly from the courthouse.  Instead, Plaintiff "was going to be released from jail later that day" and was "processed to go back to the jail" in the interim.  *Id*. at 32-33.  After the court appearance (at approximately 3:49 p.m.), Alberto (who was responsible for inmate escorts between SCCF and the courthouse) began escorting Plaintiff back through the SCCF from the "tunnel" that "connects [the SCCF] to the county court."  *Id*. at 173; *see* Ex. 1 at 15:49:32-15:50:05. Alberto walked beside Plaintiff, who was handcuffed in the front, and there was no physical contact between them.  Ex. 1 at 15:49:32-15:50:05.

### 2.    Plaintiff's Verbal Exchange With Burghardt In The Medical Corridor

At about 3:50 p.m., Burghardt stood holding a "property bag" in the doorway between the medical corridor and the back visiting gate while talking to another SCCF employee who was in the latter area.  Tr. at 242; Ex. 3 at 15:50:03.  As Alberto and Plaintiff passed behind Burghardt in the medical corridor, Plaintiff began speaking to Burghardt.  Ex. 3 at 15:50:03-15:50:09.  The parties dispute what Plaintiff said in that brief exchange.  *Compare* Tr. at 36 (Plaintiff's testimony that she informed Burghardt of her anticipated release and exclaimed that the release was "because of all the bad employees at the jail"); *with id*. at 244 (Burghardt's testimony that Plaintiff "s[aid] something like than you for putting me in disciplinary housing"); *see also id*. at 175 (Alberto's testimony that he did not recall what was said).  Subsequently, as can be seen on the video footage, (1) Burghardt turned to

---

[12] Citations to "Ex. [__]" refer to these exhibits.  In addition, the Court will cite to each video exhibit using the hour:minute:second time stamp visible on the bottom right of each video as it plays.

face Plaintiff; (2) Plaintiff walked backward away from Burghardt and raised her hands to her chest level as she continued to speak to Burghardt; (3) Plaintiff turned away from Burghardt and took a few steps farther down the medical corridor; (4) Burghardt stepped toward Plaintiff; (5) Plaintiff turned back around and faced Burghardt; (6) Plaintiff again walked backward away from Burghardt and raised her hands to her chest level as she continued to speak to Burghardt; and (7) Burghardt then walked toward Plaintiff.  Ex. 3 at 15:50:09-15:50:26.  During that exchange, Burghardt instructed Plaintiff "to stop talking" and "keep walking" as required by SCCF rules, but Plaintiff refused to do so.  Tr. at 244-46; *see id*. at 295 (Burgardt's testimony that "signs all over" the SCCF say "No talking"); *see also id*. at 185 (Alberto's testimony that he often "guide[d]" inmates along when they "were talking in the hallway" because the SCCF "prohibits" hallway discussions).

        3.    <u>Burghardt Joined The Escort Of Plaintiff Through The Medical Corridor</u>

Burghardt then placed her left hand on Plaintiff's left elbow and the group of Plaintiff, Burghardt, and Alberto began walking along the medical corridor toward the north lobby.  *See id*. at 38-39, 177, 246-48 (testimony from Plaintiff, Alberto, and Burghardt that they walked together toward the north lobby).  Burghardt remained to Plaintiff's left and holding Plaintiff's left elbow as the group walked, with Alberto in the rear, down the medical corridor without any further issue.  *See* Ex. 4 at 15:50:25-15:50:48 (footage with long hallway view); Ex. 5 at 15:50:30-15:50:42 (footage with narrower view).  Burghardt's contact with Plaintiff was simply "a move-along gesture, an escort technique that we're all taught . . . you can just put your hand on them and say, move along."  Tr. at 201 (Alberto's testimony); *see id*. at 246, 303 (Burghardt's testimony that "I placed my hand on [Plaintiff's] elbow" and used "some pressure" to "assist[] her in walking up the hallway").  After approximately thirty seconds, Burghardt let go of Plaintiff's elbow as the group continued to walk toward the north lobby.  *Compare* Ex. 4 at 15:50:25-15:50:48 (showing Burghardt holding Plaintiff's left arm) *with* Ex. 6 at 15:50:49-15:51:00 (showing Plaintiff walking free from physical contact); *see*

18

Tr. at 39, 76 (Plaintiff's testimony that Burghardt held her arm for approximately thirty seconds and "released me before we got into the north lobby area").

During the bench trial, Plaintiff repeatedly described that experience in the medical corridor as one in which she was "manhandled" by Burghardt.  Tr. at 36, 72, 73, 112, 114.  Burghardt denied that anyone ever manhandled Plaintiff at any time that day.  *Id*. at 268-69.

####       4.       Escort Through The North Lobby To The Elevator Area

At approximately 3:51 p.m., Plaintiff walked independently and free from any human physical contact into the north lobby several steps ahead of Burghardt and Alberto. Ex. 7 at 15:51:00-15:51:20; Tr. at 211.  Alberto then departed because his escorting responsibility ended there.  Tr. at 180, 285; *see also id*. at 285-86 (Burghardt's testimony that, had she not been there, another corrections officer would have taken over Plaintiff's escort once Alberto brought Plaintiff to the north lobby).  As Burghardt and Plaintiff passed the north lobby desks, Burghardt placed the property bag she had been carrying down next to next to another officer and asked Rice to assist with the escort of Plaintiff.  Ex. 7 at 15:51:00-15:51:20.  Burghardt asked Rice for assistance because (1) Rice was the first SERT officer Burghardt saw in the north lobby, (2) Burghardt "tr[ies] not to get in the elevator alone with inmates," and (3) Burghardt was concerned Plaintiff might be assaultive because of Plaintiff's earlier noncompliance with the instruction to "[stop] talking and keep walking" and Burghardt's belief that Plaintiff's wearing of a disciplinary uniform resulted from Plaintiff assaulting an inmate with a food tray.  Tr. at 264-65; *see also id*. at 336 (Rice's testimony confirming that Burghardt asked him to assist with escorting Plaintiff); *id*. at 218 (Alberto's testimony that Plaintiff wore a disciplinary uniform indicating she was an "assaultive inmate[]").  Rice, together with fellow SERT crew members, Kopczynski and Edwards, joined Burghardt's escort of Plaintiff and the group walked toward the elevators.  Ex. 7 at 15:51:00-15:51:20; Tr. at 337, 367-68.  Kopczynski and Edwards joined the escort because each SERT crew typically works together.  *See* Tr. at 367-68

(Edwards' testimony that he joined the escort because he saw Rice join the escort and the SERT crew is "a team"); *id*. at 426 (Kopczynski's testimony that he did not recall exactly why he joined the escort but he may have done so because he "saw the SERT members walking towards the elevator"); *see also id*. at 205, 361-62 (Rice's testimony that he, Kopczynski, Edwards, and Cable were all members of the same SERT crew on October 14, 2016).

5.    Events In The Right Sally Port And Elevator

Most of the events at issue that day were captured on SCCF video cameras.  However, what transpired next in the north lobby and then inside the elevator happened outside the range of cameras and are not recorded.  Between the north lobby and each adjacent elevator is an area known as a "sally port."  *Id*. at 266.  The right sally port has (1) an entryway with retractable bars to separate it from the north lobby, (2) a left side with retractable bars to separate it from the left sally port, (3) a solid wall on the right, and (4) elevator doors at the rear.  *Id*.  The right sally port and elevator lacked cameras on October 14, 2016.  *See id*. at 308, 354, 373-74, 420 (testimony from Burghardt, Rice, Edwards, and Cable acknowledging that they knew at the time that the elevator lacked cameras); *see also* ECF No. 110-9 at 63:23-64:7 (Kopzynski's deposition testimony that he was unsure of whether he knew on October 14, 2016 that the right elevator lacked cameras).  Thus, there is no video footage of what occurred in the sally port or later in the elevator.

The events that took place once Plaintiff, Burghardt, Kopczynski, and Edwards entered the right sally port are sharply disputed.  Cameras in adjacent areas show that at approximately 3:51:30 p.m., at least seven nonparty SCCF personnel in the north lobby and at least three nonparty SCCF personnel in the nearby holding pen, including Alberto, suddenly looked to and went toward the elevator area.  *See* Ex. 7 at 15:51:30-15:51:50 (north lobby footage); Ex. 8 at 15:51:30-15:51:45 (holding pen footage showing Alberto and others); *see also* Tr. at 198-99, 202-03 (Alberto's testimony confirming that he was carrying a red sweatshirt in the holding pen at that time).  The same

20

occurrence caused Cable to likewise go to the elevator area after the initial rush of responders.  Ex. 7 at 15:51:50-15:52:02; Tr. at 396-97.

According to Plaintiff, upon her entry to the sally port all of "the male defendants" (i.e. Cable, Kopcynski, Rice, and Edwards) "tackled" Plaintiff from the rear, pushed Plaintiff up against a wall that "had a glass bulletin board on it," pulled Plaintiff's hair, and then repeatedly "push[ed] me, pull[ed] me, slam[ed] me, banging me against the wall."  Tr. at 43.  Plaintiff further stated that the "bang[s]" into the bulletin board "made an impact" and "hurt" her nose, and her handcuffed "hands were impacting the wall at the same time."  *Id*. at 44; *see id*. at 45-46 (Plaintiff's testimony that she was slammed "multiple times" as the male defendants "were pushing me back and forth").  All the while, Plaintiff reportedly "was yelling help, I'm being assaulted . . . I was screaming for help and I was being assaulted and nobody came to intervene or intercede on my behalf."  *Id*. at 43.  Plaintiff testified that, when the elevator doors opened, she was shoved into the elevator's rear wall so hard that she "bit [her] lip" and then "they were pulling on my hair, slamming me, banging me against the wall while I was handcuffed the entire time."  *Id*. at 46-47.  Plaintiff reports the experience was so violent that she feared suffering brain damage.  *See id*. at 48 ("I was concerned about keeping my grey matter intact."); *see also A.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270, 1280-81 (11th Cir. 2018) (discussing how "gray matter" is part of the human brain).  Plaintiff characterized this entire experience inside the sally port and the elevator as being "manhandled."  Tr. at 63.  Plaintiff reported that afterward she felt fatigued, pain in her left wrist, and "bruised" in, as she put it, a "colloquial fashion."  *Id*. at 48-49.  As explained below, the Court finds that Plaintiff has failed to prove her version of events by a preponderance of the evidence.  *See infra* Part IV.B.

Each of the Individual Defendants categorically denied Plaintiff's allegations.  *See* Tr. at 267-69, 339-40, 369-70, 397-98, 427-28.  The Individual Defendants testified that (1) Plaintiff suddenly began screaming in the sally port; (2) the disturbance drew the attention the responding nonparty

SCCF personnel, nearby inmates, and Cable; (3) SCCF personnel cleared the area of nearby inmates; (4) Plaintiff stopped screaming after a few seconds; and (5) the Individual Defendants escorted Plaintiff on an uneventful elevator ride to the fifth floor, which lasted seconds and was devoid of force.  *See id*. at 266-70, 337-40, 368-370, 396-98, 426-429.  Relatedly, Alberto testified that he was approximately twenty feet from the elevators with a clear line of sight to them when Plaintiff was in the sally port, and he did not observe any force used upon Plaintiff.  Tr. at 206, 213-14; *see also* Ex. 8 at 15:51:30-15:51:45 (holding pen footage showing Alberto at the relevant time).

### 6. Conclusion Of The Escort By Individual Defendants

At approximately 3:52 p.m., the elevator opened on the fifth floor.  *See* Ex. 12 at 15:52:28-15:52:31 (showing officers on the fifth floor turning to look toward the elevator).  Edwards walked out, opened the cage between the elevator area and the fifth-floor lobby, looked around the area, and stepped to the side.  Ex. 12 at 15:52:30-15:52:38; *see* Tr. at 342, 372 (testimony identifying Edwards as the first to exit the elevator).  Then, Plaintiff walked out, slightly bent to the right, with (1) Cable walking on Plaintiff's left side while holding Plaintiff's handcuffs near her left side, and (2) Rice walking on Plaintiff's right side while holding Plaintiff near her right elbow.  Ex. 12 at 15:52:38-15:53:00; Tr. at 343.  The parties dispute whether Plaintiff was leaning to her right because she had just been assaulted or because of the way she was being led by her handcuffs.  *Compare* Tr. at 81 (Plaintiff's testimony that she was "bent over . . . [b]ecause I had just been assaulted and battered"); *with id.* at 343, 353-54 (Rice's testimony that Plaintiff was leaning over because "Cable was holding onto her cuffs which . . . might put her in an awkward position").  Next, Kopzynski and Burghardt exited the elevator, and the group escorted Plaintiff to and left Plaintiff in a female property area holding cell.  *See* Ex. 12 at 15:52:38-15:53:00 (showing the escort through the fifth floor lobby); Tr. at 135, 286, 340, 373, 399-400, 428 (testimony from all individual parties that the group walked Plaintiff to "female property").  According to Plaintiff, Burgardt instructed Plaintiff to "never threaten her

again." *Id*. at 50.  The Individual Defendants testified that they did not file a use of force report

because they did not use force in the elevator.[13]  *See* Tr. at 305, 348, 370, 401, 429.

### 7.    The Remainder Of Plaintiff's Incarceration At The SCCF

Plaintiff spent approximately twenty minutes in the holding cell.  *Id*. at 51.  In that time,

Plaintiff reportedly "clean[ed]" her face because she "had some blood coming out of [her] nose and

[her] lip."  *Id*.  But Plaintiff is "susceptible to nose bleeds" and as such has a history of epistaxis.  *Id*.

at 50, 85; *see also Epistaxis*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/

epistaxis (last visited Sept. 1, 2023) (explaining that epistaxis is a nosebleed).  Plaintiff also testified

that there "wasn't much" blood following her escort by the Individual Defendants and no blood got on

her clothing.  *Id*. at 50, 158-59.

The final video footage in evidence of Plaintiff at the SCCF shows three nonparty SCCF

personnel escorting Plaintiff from the holding cell to her personal cell at approximately 4:13 p.m.  *See*

Ex. 12 at 16:12:48-16:13:04 (fifth floor lobby footage); Ex. 13 at 16:13:05-16:13:20 (east front officer

walkway footage); Ex. 14 at 16:13:40-16:14:00 (east rear officer walkway footage); Tr. at 157-58

(Plaintiff's testimony that she was escorted from the holding cell to her cell).  Plaintiff acknowledged

that this footage shows her walking "upright," absent blood, and "on [her] own."  Tr. at 158-59.

At approximately 10:00 p.m., Plaintiff was released from the SCCF.  *Id*. at 53.  Plaintiff

testified that she went to two urgent care centers that night (City M.D. in Lake Grove and Excel

Urgent in Smithtown) but both were closed.  *Id*. at 53-54.  Plaintiff then went home and went to bed

without taking any medicine, applying any ice, or having difficulty sleeping (such as waking up in

pain).  *Id*. at 54, 166.

---

[13] Similarly, there was no evidence presented to the Court that anyone (the Individual Defendants, Alberto or any of the other individuals visible in the video footage) filed a use of force report regarding Plaintiff's allegations of what occurred in the SCCF on October 14, 2016.

**C.       October 15, 2016 Urgent Care Visit**

On October 15, 2016, Plaintiff went to an urgent care center in Nesconset, New York.  Tr. at

55, 138.  Plaintiff's "primary complaint that day had to do with [her] left wrist."  *Id*. at 139; *see* Ex. 21

at 1 (record for that visit reflecting that Plaintiff's "Chief Complaint" was that she "injured [her] left

wrist & [third] digit [on her] left hand while handcuffed . . . .").  Plaintiff reported pain upon flexion

of her left wrist, though she had a "good" range of motion and lacked erythema, point tenderness,

joint swelling, and joint deformity.  Ex. 21 at 1; Tr. at 143-44; *see also Erythema*, MERRIAM-

WEBSTER, http://www.merriam-webster.com/dictionary/erythema (last visited Sept. 1, 2023)

(explaining that erythema is "abnormal redness of the skin or mucous membranes due to capillary

congestion.").  Plaintiff did not report and the physical examination did not identify any bruises.  Tr.

at 144-45; *see generally* Ex. 21 (not mentioning bruises).  The x-ray of Plaintiff's wrist showed no

fracture.  Tr. at 146; *see* Ex. 21 at 4 ("Unremarkable radiographs of the LEFT wrist.").  Further

examination of Plaintiff's wrist revealed that it was "intact, without fracture or malalignment" and

otherwise was "unremarkable" in all respects.  Ex. 21 at 4.  The neurological examination found no

issues.  *See* Ex. 21 at 2.  Plaintiff was accordingly diagnosed with a "hand sprain" and given a wrist

brace to wear for "one to two weeks."  Ex. 21 at 2; Tr. at 55

Plaintiff also complained of "nasal congestion," reported her prior history of seasonal

allergies, and stated that these congestive "symptoms seem to be worse because . . . when held in

custody [her] nose was banged against [the] elevator."  Ex. 21 at 1.  Plaintiff presented no nasal

bleeding during that visit.  *See* Tr. at 141 (Plaintiff's testimony); Ex. 21 at 1 (medical record showing

Plaintiff presented "[n]o epistaxis").  At trial, Plaintiff admitted that her reported nasal congestion

may have resulted from allergies.  Tr. at 143.  The treating physician confirmed Plaintiff's reported

nasal congestion, diagnosed Plaintiff with "allergic rhinitis," instructed Plaintiff to take a "nasal spray

as prescribed" for that condition, and did not otherwise diagnose or prescribe treatment for a nasal

injury.  Ex. 21 at 1-2; Tr. at 149; *see also Rhinitis*, MERRIAM-WEBSTER, https://www.merriam-webster

.com/dictionary/rhinitis (last visited Sept. 1, 2023) (explaining that rhinitis is "inflammation of the

mucous membrane of the nose").  The treating physician from this urgent care visit did not testify at

trial.

### D.  October 19, 2016 Doctor Visit And Discovery Of Bruises

On October 19, 2016, Plaintiff and her mother went to Mid-Island Internal Medicine for a

physical examination of and certain blood tests for Plaintiff.  Tr. at 150-51.  Plaintiff complained to

the treating physician "about [her] wrist injuries" and the doctor instructed Plaintiff to disrobe.  *Id*. at

153.  Plaintiff testified that, after she removed her shirt, Plaintiff's mother "noticed" bruises on

Plaintiff's "upper right and upper left arms."  *Id*. at 58, 153.  According to Plaintiff, her mother

photographed the bruises later that day.  Tr. at 61-63.  Plaintiff's mother did not testify at trial.

Nonetheless, those undated photographs with Plaintiff's undated annotations were admitted into

evidence without objection as Exhibits 20A, 20B, and 20C, respectively, as follows:



Ex. 20A; Ex 20B; Ex. 20C; *see* Tr. at 61-63.  Plaintiff was unaware of the bruises until her mother

pointed them out.  *See* Tr. at 58.  Nonetheless, Plaintiff believes these bruises resulted from her

interaction with the Individual Defendants five days earlier because "[n]othing physical had happened to me in that time period, in those five days" and "that's where they manhandled me. That's where they grabbed me. They were holding me on my upper arms, when they were slamming me . . . ." *Id.* at 63-64.

Plaintiff presented no nasal issues at the time of her October 19, 2016 examination. *See id.* at 154 ("[T]here wasn't any problem with my septum. The doctor didn't find any polyps in my nose, and mucosa in the nose was normal."). Plaintiff did not recall having any swelling at the time of that examination. *Id.* at 155. Plaintiff reported that she lacked "head injuries" at the time of the examination. *Id.* Plaintiff acknowledged that, despite her bruises and reported wrist pain, the treating physician concluded that Plaintiff was "well." *Id.* at 157. The treating physician who conducted this physical examination did not testify at trial.

## III.   LEGAL STANDARDS

### A.   Standard Of Proof And Credibility Assessments

Plaintiff bears the burden to prove her claims by a preponderance of the evidence. *See Outlaw v. City of Hartford*, 884 F.3d 351, 368 (2d Cir. 2018) (addressing constitutional excessive force claim brought under 42 U.S.C. § 1983); *Cunningham v. United States*, 472 F. Supp. 2d 366, 384 (E.D.N.Y. 2007) (addressing assault and battery claims under New York law). The burden of showing a preponderance of evidence "simply requires the trier of fact to believe that the existence of a fact is more probable than its nonexistence." *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997) (quoting *Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.*, 508 U.S. 602, 622 (1993)). Under that standard, "the party with the burden of proof would lose in the event that the evidence is evenly balanced." *Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706, 731 (2d Cir. 2001); *see United States v. Gigante*, 94 F.3d 53, 55 (2d Cir. 1996) ("The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is

26

evenly balanced, the party with the burden of proof loses.").

After a bench trial, it "is within the province of the district court as the trier of fact to decide whose testimony should be credited.  And as trier of fact, the judge is entitled, just as a jury would be, to believe some parts and disbelieve other parts of the testimony of any given witness." *Diesel Props S.r.l. v. Greystone Business Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011) (internal quotations and citations omitted).  Similarly, following a bench trial "the weight to be given to particular pieces of evidence" is "peculiarly within the province of the [judge as] trier of fact" and these determinations are "entitled to considerable deference." *Cont'l Ins. Co. v. Lone Eagle Shipping (Liber.)*, 134 F.3d 103, 104 (2d Cir. 1998).

### B.    Excessive Force Claim

Plaintiff asserts her excessive force claim pursuant to Section 1983.  That statute "provides a civil claim for damages against any person who, acting under color of state law, deprives another of a right, privilege or immunity secured by the Constitution or the laws of the United States."[14] *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999); *see* 42 U.S.C. § 1983.  "It is well-settled that § 1983 does not create a federal right or benefit; it simply provides a mechanism for enforcing a right or benefit established elsewhere." *Morris-Hayes v. Bd. of Educ.*, 423 F.3d 153, 159 (2d Cir. 2005).  Accordingly, "[a]nalysis of a claim for use of excessive force begins with 'identification of the specific constitutional right allegedly infringed by the challenged application of force.'" *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)) (internal alterations omitted).

The Fourteenth Amendment's "Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015)

---

[14] The parties stipulated that the Individual Defendants acted under color of state law at all relevant times.  *See* ECF No. 155-1 ¶ 1.

(quoting *Graham*, 490 U.S. 395 n.10).  As a pretrial detainee bringing an excessive force claim, Plaintiff must establish "that the force purposely or knowingly used against [her] was objectively unreasonable."  *Id.* at 396-97; *see also Edrei v. Maguire*, 892 F.3d 525, 537 (2d Cir. 2018) ("*Kingsley* provides the appropriate standard for all excessive force claims brought under the Fourteenth Amendment.").  To start, such force must be "either 'more than *de minimis*' or 'repugnant to the conscience of mankind.'"  *Lewis v. Huebner*, No. 17-CV-8101, 2020 WL 1244254, at *5 (S.D.N.Y. Mar. 16, 2020) (quoting *United States v. Walsh*, 194 F.3d 37, 48 (2d Cir. 1999)); *see Wilkins v. Gaddy*, 559 U.S. 34, 37-38 (2010) (applying this standard under the Eighth Amendment)[15]; *Lynch v. City of New York*, 952 F.3d 67, 77 (2d Cir. 2020) (affirming dismissal of pretrial detainee's Fourteenth Amendment claim because "there is a *de minimis* level of imposition with which the Constitution is not concerned" (internal quotations omitted)).  "Actions are repugnant to the conscience of mankind if they are incompatible with evolving standards of decency or involve the unnecessary and wanton infliction of pain." *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015); *see Hogan v. Fischer*, 738 F.3d 509, 516 (2d Cir. 2013) (explaining that force involving torture, humiliation, or degradation is repugnant to the conscience of mankind and finding that spraying inmates with vinegar, feces, and machine oil qualified as such force).

If the force used by a state actor clears that threshold, the factfinder "must assess excessive force claims from 'the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight.'"  *Edrei*, 892 F.3d at 544 (quoting *Kingsley*, 576 U.S. at 397).  In doing so, the factfinder may consider the following non-exhaustive factors to

---

[15] Courts consider Fourth and Eighth Amendment excessive force cases instructive to Fourteenth Amendment excessive force cases.  *See Edrei*, 892 F.3d at 542 n.5 (noting "the practice of the Supreme Court and [the Second] Circuit, both of which cross-pollinate between Fourth, Eighth, and Fourteenth Amendment contexts" for claims of excessive force); *Darnell v. Pineiro*, 849 F.3d 17, 34 (2d Cir. 2017) (explaining that Eighth Amendment cases are relevant to Fourteenth Amendment claims because "they address the practical importance of taking into account the legitimate safety-related concerns of those who run jails"); *Walsh*, 194 F.3d at 48 (explaining that the same standard applies under the Eighth and Fourteenth Amendment to determine the objective reasonableness of force used on the incarcerated).

determine whether the force was objectively unreasonable: (1) "the relationship between the need for the use of force and the amount of force used," (2) "the extent of the plaintiff's injury," (3) "any effort made by the officer to temper or to limit the amount of force," (4) "the severity of the security problem at issue," (5) "the threat reasonably perceived by the officer," and (6) "whether the plaintiff was actively resisting." *Id*. (quoting *Kingsley*, 576 U.S. at 397). These are known as "the *Kingsley* factors." *Id*. at 540. The factfinder undertaking that analysis "must account for the legitimate interests stemming from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Kingsley*, 576 U.S. at 389 (internal quotations and alterations omitted).

Finally, "the personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (internal quotations omitted). In the excessive force context, a corrections officer is personally involved "if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Watts v. N.Y.C. Police Dep't*, 100 F. Supp. 3d 314, 326 (S.D.N.Y. 2015) (quoting *Russo v. DiMilia*, 894 F. Supp. 2d 391, 414 (S.D.N.Y. 2012)); *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003), *aff'd sub nom. Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005). "'A plaintiff need not establish who among a group of officers, directly participated in the attack and who failed to intervene.'" *Corley v. Shahid*, 89 F. Supp. 3d 518, 523 (E.D.N.Y. 2015) (quoting *Jeffreys*, 275 F. Supp. 2d at 474). That rule "is especially important 'where the acts complained of by the plaintiff, if true, (e.g., mace to the eyes, standing on back, "mushing" face into the ground) are likely to have prevented plaintiff from identifying which of [multiple] defendant officers specifically engaged in the bad acts.'" *Gonzalez v. Waterbury Police Dep't*, 199 F. Supp. 3d 616, 622 (D. Conn. 2016) (quoting

*Shankle v. Andreone*, No. 06-CV-487, 2009 WL 3111761, at *5 (E.D.N.Y. Sept. 25, 2009)); *see Corley*, 89 F. Supp. 3d at 524 ("It would be too much to require a citizen subjected to a police attack to separately identify the role of each defendant—he is, after all, under attack.").

## C.     Assault And Battery

Under New York law, civil assault "is an intentional placing of another person in fear of imminent harmful or offensive contact," and civil battery "is an intentional wrongful physical contact with another person without consent." *Tardif v. City of N.Y.*, 991 F.3d 394, 410 (2d Cir. 2021) (quoting *Charkhy v. Altman*, 252 A.D.2d 413, 414 (N.Y. App. Div. 1st Dep't 1998)). Notably, "[t]he elements of New York assault and battery and Section 1983 excessive force claims are 'substantially identical.'" *Id.* (quoting *Posr v. Doherty*, 944 F.2d 91, 94-95 (2d Cir. 1991)); *see Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009) (explaining that the standards are the same "[e]xcept for § 1983's requirement that the tort be committed under color of state law" (quoting *Posr*, 944 F.2d at 94-95)).

## D.     Vicarious Liability

"Under New York common law, an employer is liable for the actions of an employee if her actions were foreseeable and if she acted within the scope of her employment."[16] *Doe v. Guthrie Clinic, Ltd.*, 710 F.3d 492, 495 (2d Cir. 2013) (citing *Horvath v. L & B Gardens, Inc.*, 89 A.D.3d 803, 803 (N.Y. App. Div. 2d Dep't 2011)). Such vicarious liability for an employee's violation of New York law applies to municipalities. *See Ackerson v. City of White Plains*, 702 F.3d 15, 22 (2d Cir. 2012) (finding that plaintiff's "state law false arrest claim creates liability for the City of White Plains, under a theory of *respondeat superior*"); *Frederique v. Cnty. of Nassau*, 168 F. Supp. 3d 455, 482

---

[16] Plaintiff's claim against the County seeks only vicarious liability under New York law for her assault and battery claims against the Individual Defendants. *See* Tr. at 518-19; ECF No. 158 at 42 (Plaintiff's posttrial submission). Plaintiff does not seek municipal liability under *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978) and its progeny for her excessive force claims.

(E.D.N.Y. 2016) ("[A] municipality may be vicariously liable for the common law torts of its employees.").  Consequently, "New York courts have held municipalities liable under a theory of *respondeat superior* for . . . assault and battery claims."  *Graham v. City of New York*, 928 F. Supp. 2d 610, 626 (E.D.N.Y. 2013) (collecting cases); *see Green v. City of New York*, 465 F.3d 65, 86 (2d Cir. 2006) (recognizing that a municipality may be "liable for . . . assault and battery[] committed by its employees provided that the tort is committed within the scope of the plaintiff's employment").

## IV.   CONCLUSIONS OF LAW

It was Plaintiff's burden to prove at trial by a preponderance of the evidence that the Individual Defendants were personally involved in the purposeful or knowing use of objectively unreasonable physical force against Plaintiff on October 14, 2016.  In the Court's judgment, Plaintiff failed to meet this burden.

### A.   Witness Credibility

As noted above, much of the subject escort of Plaintiff is documented in SCCF video footage. The alleged infliction of excessive force in the sally port and elevator, however, occurred almost entirely outside the view of SCCF cameras.  Evidence concerning that alleged excessive force largely falls into two categories: Plaintiff's testimony and the Individual Defendants' testimony. Unsurprisingly, Plaintiff and the Individual Defendants presented dramatically different versions of what happened in the sally port and elevator.  The limited non-testimonial evidence related to those events sheds little light on what transpired.  The Court thus must assess the witnesses' credibility to resolve these factual disputes.  In making that assessment, the Court recognizes that over six years elapsed between the date of the alleged assault and the trial in this case.  Additionally, the critical events at issue—the escort through the sally port and elevator—transpired over mere seconds.  As a result, some minor inconsistencies are expected across the witnesses' testimony.  Nevertheless, the Court highlights below select concerns regarding certain witnesses' credibility.

1.     Plaintiff's Credibility

Plaintiff's testimony was not credible in multiple and significant respects.  In those instances,

Plaintiff's testimony was inconsistent or undermined by the evidence.  Key examples follow.

Plaintiff repeatedly testified that Burghardt "manhandle[d]" her down the medical corridor.

Tr. at 36, 72, 73, 112, 114.  While that video footage shows Burghardt holding Plaintiff's left elbow

for approximately thirty seconds, it does not in the Court's estimation show anything close to a

manhandling.  *See* Ex. 4 at 15:50:25-15:50:48; Ex. 6 at 15:50:49-15:51:00; *see also* Tr. 201, 246

(testimony from Burghardt and Alberto describing the contact with Plaintiff in the medical corridor

consistent with the video footage); *Manhandle*, MERRIAM-WEBSTER, https://www.merriam-webster

.com/dictionary/manhandle (last visited Sept. 1, 2023) (explaining that manhandle means "to handle"

so "roughly" that it is synonymous with "maul").  That Plaintiff used the same word to describe the

alleged assault in the sally port and elevator (which is not videotaped) significantly undermines

Plaintiff's credibility with respect to that crucial portion of her escort.  *See* Tr. at 63-64 ("[T]hey

*manhandled* me . . . when they were slamming me against the wall -- the walls." (emphasis added)).

Plaintiff testified that when she entered the sally port "the four male defendants[] tackled me

from behind."  *Id*. at 43.  But on cross examination, Plaintiff stated with respect to the events in the

sally port "when they assaulted me, my back was turned to them so I don't know who's there . . . I

don't know who is there."  *Id*. at 124.  And when asked on cross examination whether Cable was

already with Plaintiff at the time nonparty officers in the north lobby responded to Plaintiff's alleged

assault, Plaintiff testified "I don't know where he was at that time."  *Id*. at 123.  Indeed, the footage

shows that Cable went to the sally port approximately forty-five seconds after the other Individual

Defendants escorted Plaintiff to that location and approximately thirty seconds after nonparty SCCF

personnel began responding to that location.  Ex. 7 at 15:51:00-15:52:00; *see* Tr. at 253 (Burghardt's

testimony identifying Cable in that footage); *Id*. at 397 (Cable's testimony that he went to the sally

port after Plaintiff's outburst).

Plaintiff testified that she sustained the bruises on her arms depicted in the undated photographs at Exhibits 20A, 20B, and 20C during the alleged assault in the sally port and elevator. Tr. at 63-64.  But Plaintiff later testified that she may have sustained some of those bruises from Burghardt's brief hold on her arm in the medical corridor.  *See id*. at 114-17 ("Q. Are you telling us that possibly Investigator Burghardt inflicted some minor injuries upon you in the hallway? . . . A. As you know, my attorney entered into evidence some photographs that were taken of my upper right and left arms . . . I had a bruise on my upper left arm[]. Burghardt could have caused that. It's possible, I don't know.").

The claimed brutality Plaintiff testified to enduring is not supported by the evidence.  As indicated above, Plaintiff testified that (1) "the four male defendants[] tackled me from behind"; (2) they then "push[ed]," "pull[ed]," "slamm[ed]," and "bang[ed]" Plaintiff nose-and-wrists first into a bulletin board in the sally port "multiple times"; (4) the "four men [continued] tackling me like they were part of a football team"; (5) the group then "slamm[ed]" Plaintiff into the elevator's rear wall so hard that she "bit [her] lip"; and finally (6) inside the elevator "they were pulling on my hair, slamming me, banging me against the wall while I was handcuffed the entire time."  *Id*. at 43-47.  In five respects, the evidence did not conform with Plaintiff's account.

- ***First***, Plaintiff's testimony was inconsistent as to whether she bled from her lip.  *Compare id*. at 51 ("I had some blood coming out of . . . my lip.") *with id.* at 46 ("Q. Was the lip bleeding? A. Not that I was aware of.").

- ***Second***, Plaintiff testified that she bled from her nose, but confirmed it "wasn't much" and (or even though) she "is susceptible to nose bleeds." *Id*. at 51.  Further, (1) Plaintiff acknowledged that the video footage shows no observable blood on her clothing when she exits the elevator at the fifth floor (*id*. at 159), (2) Plaintiff could not recall whether blood ever came into contact with her clothing (*id*), and (3) Plaintiff's medical examination the day after the supposed assault found with respect to Plaintiff's nose that she merely suffered from "*allergic* rhinitis." Ex. 21 at 2 (emphasis added).

- ***Third***, Plaintiff testified that she suffered wrist pain (Tr. at 48-49*)* but the physician who examined Plaintiff the day after the supposed assault diagnosed only a wrist sprain because

Plaintiff's wrist—which had a full range of motion—lacked redness, bruising, tenderness, swelling, or deformity, and the treating physician concluded that Plaintiff's wrist was "intact, without fracture or malalignment" and was "unremarkable" in all respects.[17]  Ex. 21 at 1-4; *see also Martin v. City of Okla. City*, 180 F. Supp. 3d 978, 993 (W.D. Okla. 2016) (holding that arrestee's wrist sprain is a *de minimis* injury); *Berry v. Windham*, No. CIVA 07-1860, 2008 WL 2455614, at *6 n.3 (W.D. La. May 29, 2008) (finding that inmate's "injuries were in the nature of a sprain, a strain, or a contusion . . . In short, plaintiff's alleged injuries are *de minimis*."); *Mayes v. Carey*, No. CIV. A. L-99-3467, 2000 WL 1094102, at *1 (D. Md. Aug. 4, 2000) (finding that inmate's wrist sprain was a *de minimus* injury).[18]

- **Fourth**, Plaintiff reported that she feared the severity of the assault could have inflicted brain damage.  *See* Tr. at 48 ("I was concerned about keeping my grey matter intact.").  But the neurological portion of Plaintiff's medical examination the day after the assault found no issues, and Plaintiff did not report seeking any assessment for brain damage.  *See* Ex. 21 at 2 (neurological examination results); Tr. at 141 (Plaintiff's testimony that she did not inform the doctor about any potential head injury because "the primary reason why I visited the doctor was for them to examine my wrist, my left wrist").

- **Fifth**, despite the severity of the supposed assault, Plaintiff testified that she contemporaneously felt that she was bruised only "in a more colloquial fashion."[19]  Tr. at 48.  Indeed, the bruises were first noticed by Plaintiff's mother five days after the alleged assault.  *Id*. at 58.

Finally, Plaintiff's demeanor during her testimony further weakened her credibility.  Plaintiff was argumentative and confrontational during cross examination, despite her earlier calm and cooperative testimony about the same subject matter during direct examination by her counsel.  Defense counsel's questions were not so provocative as to trigger such a response by Plaintiff.  In fact, the Court intervened on multiple occasions to direct Plaintiff to stop being argumentative and answer

---

[17]  In addition, though Plaintiff testified that she requested medical treatment and those requests were denied, she does not specify to whom she made those requests and who denied them.  *See* Tr. at 52, 142, 155.  There is no evidence that Plaintiff sought medical treatment at the SCCF in the over five hours between the time she returned to her personal cell (and was then away from the Individual Defendants) and the time she was released from the SCCF.

[18]  To be clear, an excessive force claim does not require serious injury.  *See Wilkins*, 559 U.S. at 38 ("An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury.").  However, "the absence of serious injury is certainly a matter that the [fact finder] can consider in assessing" questions of fact (and damages).  *Ketcham v. City of Mount Vernon*, 992 F.3d 144, 151 (2d Cir. 2021); *see Wilkins*, 559 U.S. at 37 ("The extent of injury may also provide some indication of the amount of force applied.").  Indeed, an excessive force claim lacking serious injury may succeed "*if* a [fact finder] credits [the plaintiff]'s testimony" about being subjected to excessive force.  *Ketcham*, 992 F.3d at 151 (emphasis added).

[19]  When later questioned by the Court about what she meant by "colloquial fashion," Plaintiff explained "to me, I think of the word bruise, it means an injury of some sort or discomfort."  Tr. at 167.

defense counsel's questions.  *See* Tr. at 89-90, 94-96, 102, 116-17.  Then, after the lunch break,

Plaintiff testified that she did not discuss her testimony with her counsel during the lunch break and

instead reported that she spoke with her counsel during that time only about "procedure."  *Id.* at 122.

Notably, following the lunch break, Plaintiff's tone calmed and she repeatedly claimed that she was

not trying to be "argumentative" or "evasive."  *Id.* at 128, 129, 130, 156, 160.  All of this collectively

reduces the credibility of Plaintiff's testimony.  *See Wright v. Musanti*, 887 F.3d 577, 583, 587 (2d

Cir. 2018) (affirming bench trial decision that found a party's testimony was not credible partly

because her "demeanor was excitable, impulsive, and defensive" (internal quotations omitted));

*Mango v. BuzzFeed, Inc.*, 356 F. Supp. 3d 368, 373 (S.D.N.Y. 2019) (finding after a bench trial that a

witness was not credible partly because of his "obfuscatory and defensive demeanor in the courtroom

during his testimony"), *aff'd*, 970 F.3d 167 (2d Cir. 2020).

### 2.   The Individual Defendants And Alberto's Credibility

The Court largely credits the testimony of the Individual Defendants and Alberto, despite

potential biases and certain testimony the Court finds not credible.  The Court is mindful of potential

biases arising from the following facts: the Individual Defendants are "all friends" with each other

(Tr. at 273-274), Alberto and Burghardt have known each other for over ten years (*id.* at 187-88), and

liability for excessive force would impose professional consequences on the Individual Defendants

(*id.* at 367-68, 408).

While the Court credits Burghardt's testimony that there was no excessive force used against

Plaintiff at any time, the Court finds that Burghardt's explanation for joining Plaintiff's escort is not

credible.  That is, the Court does not credit Burghardt's testimony that when she joined the in-progress

escort of Plaintiff—right after Plaintiff admittedly "was just rubbing [Burghardt's] face in it that

[Plaintiff] was being released" (*id.* at 108)—Burghardt was neither angry at nor annoyed by Plaintiff.

*Id.* at 284.  The Court likewise finds dubious Burghardt's testimony that she joined the escort because

she "didn't want [the situation] to escalate and I didn't think [Plaintiff] would stop." *Id*. at 246.  At

that time, Alberto had the escort under control; both he and Plaintiff were heading toward the north

lobby, their intended destination, and away from Burghardt.  Ex. 3 at 15:50:22-15:50:30.  Burghardt

could have diffused the state of affairs by removing herself—the only subject of Plaintiff's admitted

taunting—from the situation and not engaging with Plaintiff or the escort.[20]

Additionally, Burghardt's testimony about how far she intended to escort Plaintiff is

inconsistent.  Burghardt testified at trial that she "decided *before* [she] got to the elevator that [she]

w[as] going to take Ms. Hart all the way up to the 5th floor . . . [she] didn't make that decision based

on [Plaintiff's] outburst."  *Id*. at 286 (emphasis added).  Burghardt previously testified at her

deposition that she "probably" would have left Plaintiff's escort in the sally port but escorted Plaintiff

to the fifth floor because Plaintiff "had an outburst."  *Id*. at 289-90.  However, none of this impacts the

Court's finding that Burghardt and the other Individual Defendants' testimony was credible about the

lack of excessive force inflicted on Plaintiff.[21]

## B.    Weight Of The Evidence

Plaintiff contends that she was subject to excessive force, assault, and battery by Burghardt in

the medical corridor, and by all the Individual Defendants in the sally port and elevator.  *See* ECF No.

158 at 28 (Plaintiff's posttrial submission).  Plaintiff also contends that the County is vicariously

---

[20] Alberto testified that he could not recall any other time when Burghardt joined him on an inmate escort.  Tr. at 172.  Alberto also testified that it was "uncommon" for another officer to join him on an escort, but other officers sometimes joined him if they felt a prisoner was behaving abnormally or aggressively.  *See id*. at 219-220.

[21] Plaintiff criticizes the Individual Defendants and Alberto for testifying that they lack an independent recollection of the escort.  *See* ECF No. 158 at 21-22 (citing Tr. at 220-21, 327, 363-64, 375, 407, 429).  But the Court does not fault those witnesses for lacking an independent recollection of an escort that took place six years ago in which, as they put it, "nothing happened" (other than Plaintiff's momentary scream in the sally port).  Tr. at 269, 345, 373, 401, 429.  The Court does find that Edwards, Cable, and Kopczynski made poor choices in attending their codefendants' depositions because that left them open to Plaintiff's attack, which the Court is not adopting, that those defendants coordinated their testimony.  *See* ECF No. 158 at 20-21; *see also* Tr. at 385 (Edwards' testimony that he attended Cable's deposition); *id*. at 405 (Cable's testimony that he attended Burghardt's deposition); *id*. at 429 (Kopczynski's testimony that he attended Rice's deposition).  Finally, the Court does not credit Plaintiff's argument that the Chiaro Allegations show that Defendants either acted with a "plan" to assault her or are otherwise "hiding *something*."  ECF No. 158 at 43.

liable for the Individual Defendants' commission of assault and battery.  *See id.* at 42.  After assessing

the witnesses' credibility and evaluating the other evidence admitted at trial, the Court finds that

Plaintiff has failed to prove her claims.

      1.    <u>Section 1983 Excessive Force Claims</u>

      Based on the evidence presented at trial (including the video footage of the entire incident),

Burghardt's escort of Plaintiff down the SCCF medical corridor is not even remotely actionable and

this claim is borderline frivolous.  As noted above, SCCF footage as well as testimony from Burghardt

and Alberto make clear that Burghardt merely held Plaintiff's elbow for approximately thirty seconds

while guiding her down the medical corridor.  "Courts have held that isolated, *de minim*[*i*]*s* uses of

force against involuntarily committed plaintiffs do not constitute excessive force and are thus not

constitutional deprivations."  *Vallen v. Newson*, No. 16-CV-2632, 2019 WL 1317569, at *4 (E.D.N.Y.

Mar. 22, 2019) (emphasis removed); *see Wilkins*, 559 U.S. at 37-38 (holding that *de minmis* force

alone is not excessive force); *see also Wright*, 554 F.3d at 269 ("Not every push or shove, even if it

may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional

rights." (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992))).  That *de minimis* contact in the medical

corridor cannot sustain an excessive force claim.  *See Frost v. New York City Police Dep't*, 980 F.3d

231, 256 (2d Cir. 2020) (affirming dismissal of pretrial detainee's excessive force claim where "the

video footage does not suggest that the officers' actions could reasonably be viewed as excessive.");

*Costanzo v. Santacroce*, No. 16-CV-03871, 2023 WL 4247636, at *3 (E.D.N.Y. June 29, 2023)

(finding pretrial detainee failed to prove excessive force where the evidence showed defendants

merely "guided" her); *Vallen*, 2019 WL 1317569, at *4 (dismissing excessive force claims predicated

on being twice pushed into a wheelchair because that force was *de minimis*).

      The Court likewise finds that Plaintiff failed to prove her claims predicated on events in the

sally port and the elevator that are not videotaped.  As noted above, the Court finds that Plaintiff

suffers from significant credibility issues while the Individual Defendants and Alberto were generally credible.  *See supra* Part IV.A.  The Individual Defendants' uniformly testified that they did not use excessive force on Plaintiff, and instead used *de minimis* force by holding Plaintiff while escorting her after her outburst in the sally port.  *See* Tr. at 266-70, 337-40, 368-370, 396-98, 426-429.  Alberto relatedly testified that he had a clear line of sight to the elevators while Plaintiff was in the sally port and he did not observe any force used upon Plaintiff.  *Id.* at 206, 213-14; *see also* Ex. 8 at 15:51:30-15:51:45 (holding pen footage of Alberto at the relevant time).  The collective testimony from the Individual Defendants and Alberto carries greater weight, is incompatible with a finding that any Individual Defendant used or could have intervened against excessive force, and necessitates a finding for Defendants.  *See Costanzo*, 2023 WL 4247636, at *3 (finding excessive force claims not proven at bench trial); *Vallen*, 2019 WL 1317569, at *4 (dismissing excessive force claims that were based on *de minimis* contact); *Corley*, 89 F. Supp. 3d at 524 (dismissing excessive force claim where plaintiff could not "show that *any* of defendants played *any role* in the attack, nor that *any* defendant had failed to intervene").

2.   Assault And Battery Claims Under New York Law

As explained above, "[t]he elements of New York assault and battery and Section 1983 excessive force claims are 'substantially identical.'"  *Tardif*, 991 F.3d at 410 (quoting *Posr*, 944 F.2d at 94-95).  The standards are the same "[e]xcept for § 1983's requirement that the tort be committed under color of state law."  *Humphrey*, 344 F. App'x at 688 (quoting *Posr*, 944 F.2d at 94-95).  The instant assault and battery claims fail given Plaintiff's failure to prove her excessive force claims.  *See Harrison v. Inc. Vill. of Freeport*, 498 F. Supp. 3d 378, 397 (E.D.N.Y. 2020) (dismissing assault and battery claims because they were premised on the same facts as deficient Section 1983 excessive force claims); *Sanders v. City of Rochester*, 360 F. Supp. 3d 152, 168 (W.D.N.Y. 2019) (same); *Tompkins v. City of N.Y.*, 50 F. Supp. 3d 426, 440 (S.D.N.Y. 2014) (same).

3.      Vicarious Liability

It is well established under New York law that "there can be no imposition of vicarious liability in the absence of underlying liability." *Boyler v. City of Lackawanna*, 287 F. Supp. 3d 308, 327 (W.D.N.Y. 2018) (internal quotations omitted), *aff'd*, 765 F. App'x 493 (2d Cir. 2019); *Davison v. Goodwill Indus. of Greater New York & N. New Jersey, Inc.*, No. 10-CV-2180, 2012 WL 1067955, at *5 (E.D.N.Y. Mar. 28, 2012) (internal quotations omitted); *see Karaduman v. Newsday, Inc.*, 51 N.Y.2d 531, 546, 416 N.E.2d 557, 564 (1980) ("[I]t is manifest that there can be no vicarious liability on the part of the employer if the employee himself is not liable.").  Accordingly, because Plaintiff failed to prove her assault and battery claims against the Individual Defendants, Plaintiff's pursuit of vicarious liability against the County fails.  *See Boyler*, 287 F. Supp. 3d at 327 (dismissing vicarious liability claims against a municipality because the underlying assault and battery claims were dismissed); *Udechukwu v. City of N.Y.*, 333 F. Supp. 3d 161, 170 (E.D.N.Y. 2018) ("[T]here is no basis for a claim of municipal liability because Plaintiff has not alleged a viable claim against Officers Doll and Delsano.").

## V.      CONCLUSION

Notwithstanding the apparent sincerity of Plaintiff's beliefs about what transpired on October 14, 2016, the Court finds for the reasons set forth above that Plaintiff has failed to meet her burden to prove her claims by a preponderance of the evidence.  As a result, Defendants are not liable to Plaintiff.

**SO ORDERED:**

Dated:      Central Islip, New York
            September 5, 2023

s/ Lee G. Dunst

**LEE G. DUNST**
United States Magistrate Judge